# EXHIBIT L

Case 1:07-cv-03219-LTS-DCF   Document 191-4   Filed 04/18/2008   Page 1 of 19

Ira S. Sacks
Mary L. Grieco
Safia A. Anand
DREIER LLP
499 Park Avenue
New York, NY 10022
(212) 328-6100

Lisa T. Simpson
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 5th Avenue
New York, NY 10103
(212) 506-5100

*Attorneys for Plaintiff/Counterclaim Defendant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

| | |
|---|---|
| SANEI CHARLOTTE RONSON LLC, | : |
| | : Civil Action No. 07CV9578 (RWS)(DCF) |
| Plaintiff/Counterclaim Defendant, | : |
| | : |
| -against- | : **DECLARATION OF IRA S. SACKS** |
| | : **IN SUPPORT OF MOTION FOR** |
| | : **SANCTIONS PURSUANT TO** |
| GMA ACCESSORIES, INC., | : **RULE 37 AND 28 U.S.C. § 1927** |
| | : |
| Defendant/Counterclaim Plaintiff | : |

------------------------------------------------------------x

Ira S. Sacks, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1. I am partner at the law firm Dreier LLP (the "Dreier Firm"), counsel for Plaintiff/Counterclaim Defendant Sanei Charlotte Ronson LLC ("Ronson"). I submit this Declaration in support of Ronson's motion for sanctions pursuant to Federal Rule of Civil Procedure Rule 37, 28 U.S.C. § 1927 and the inherent power of the Court (*see Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)), against the Bostany Law Firm (the "Bostany Firm") and against GMA Accessories, Inc. ("GMA"). Other than as expressly set forth, this declaration is

made upon personal knowledge.

2. John Bostany, The Bostany Firm and GMA are in violation of Rule 37 and 28 U.S.C. § 1927 for at least two separate reasons. First, GMA vastly overstated the documents upon which it intends to rely at trial in its Initial Disclosures and thereafter Mr. Bostany confirmed these misrepresentations to the Court on March 14, 2008. Second, in response to Ronson's Requests for Documents, GMA and the Bostany Firm dumped a disorganized mish-mash of approximately 35,000 pages of documents on Ronson, hundreds – maybe thousands – of which are irrelevant or duplicates. Both of these reasons are described more fully below and the document dump is described more fully in the accompanying declaration of Warren Singh.[1]

---

[1] Federal Rule of Civil Procedure Rule 37 provides, in pertinent part:
   **(c) Failure to Disclose; to Supplement an Earlier Response, or to Admit.**
   **(1) Failure to Disclose or Supplement.**

   If a party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

   (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

   (B) may inform the jury of the party's failure; and

   (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

   **(d) Party's Failure to Attend Its Own Deposition, Serve Answers to Interrogatories, or Respond to a Request for Inspection.**
   **(1) In General.**

   (A) *Motion; Grounds for Sanctions*. The court where the action is pending may, on motion, order sanctions if: (ii) a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers, objections, or written response.

   (B) *Certification*. A motion for sanctions for failing to answer or respond must include a certification that the movant has in good faith conferred or attempted to confer with the party failing to act in an effort to obtain the answer or response without court action.

   **(3) Types of Sanctions.**

   Sanctions may include any of the orders listed in Rule 37(b)(2)(A)(i)-(vi). Instead of or in addition to these sanctions, the court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

28 U.S.C. § 1927 provides that "Any attorney or other person admitted to conduct cases in any court of the United

3.  This is not the first time that Mr. Bostany has abused the litigation process with respect to the very documents at issue. In *GMA Accessories, Inc. v. Positive Impressions, Inc.* NYLJ Vol. 223, No. 90 (SDNY May 10, 2000), Magistrate Judge Ellis sanctioned Mr. Bostany and reprimanded him for his behavior in the discovery process. In that case, Defendants' counsel was required to send a paralegal to New Jersey to inspect 30,000 documents, only to be refused access to inspect said documents upon arriving at the premises.

4.  Judge Ellis described the matter as involving "particularly contentious counsel with an affinity for protracted motion practice." *Id.* at *1. After describing the factual history of the matter, the court conducted "[a]n examination of Bostany's submissions" which showed "the continual pattern of deception." *Id.* at *7. After discussing three specific areas of deception, Judge Ellis concluded that "[n]o statement, on its own and on its face, can be said to be an explicit lie by Bostany. However, counsel continually made statements to the Court regarding these incidents [that] were designed to leave the Court with false impressions, when GMA and Bostany knew facts which contradicted those impressions. Calculated deception to the Court to this degree is not tolerable and is sanctionable." *Id.*

5.  Specifically, Judge Ellis found:

> more disturbing to the Court, however, is the behavior of GMA's counsel, John Bostany. Combining the talents of an old carnival huckster and an ancient Greek sophist, Bostany has undertaken to impose upon the Court a kind of shell game, using language to misdirect and mislead, until finally delivering the invoices to the courtroom. This dramatic flourish might be appropriate for Madison Square Garden, but not the Southern District of New York.

*Id.* at *6-7. Attached hereto as Exhibit A is a true and correct copy of the decision in *GMA Accessories, Inc. v. Positive Impressions, Inc.* NYLJ Vol. 223, No. 90 (S.D.N.Y. May 10, 2000).

---

States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

6.    Mr. Bostany has not changed his ways. His statements to the Court and GMA's submissions are plainly sanctionable.

**<u>GMA'S INITIAL DISCLOSURES</u>**

7.    On December 17, 2007, GMA served its Initial Disclosures on Ronson. In the disclosures, GMA "respectfully refers to the documents identified in the C. Ronson TTAB proceeding and the *GMA v Eminent* case. In addition, Sales Orders, Advertising Expenses, Advertisements and Cease and Desist communications." *See* Defendant's Initial Disclosures, ¶ B, attached hereto as Exhibit B.

8.    On a number of occasions, Ronson's counsel conferred in good faith with GMA's counsel in an effort to obtain revised initial disclosures specifying the documents GMA was referring to in its initial disclosures. Ronson has even brought this issue to the Court's attention; however, to date, GMA has failed to amend its disclosures.

9.    On March 5, 2008, the Court directed GMA to do the following:

> . . . supplement its initial disclosures under Rule 26(a) of the Federal Rules of Civil Procedure by producing or making available for inspection the documents that Defendant states in its disclosures were produced in connection with other proceedings, or, if the documents have already been produced by Defendant in this litigation, by identifying those documents with specificity (as, for example, by Bates numbers).

*See* March 5, 2008 Order, ¶ 3.

10.    Instead of providing a Supplemental Disclosure as per the Court's Order, GMA stated the following in a letter, dated March 12, 2008.

> We hereby supplement GMA's initial disclosures as follows: In addition to the documents identified in Mr. Bostany's letter to you dated December 4, 2007, GMA plans to introduce as evidence the documents delivered to Mr. Grand by Dana Melissinos and the sales records that have been available for your inspection since December 2007.

11.    A true and correct copy of Mr. Bostany's December 4, 2007 letter is attached

hereto as Exhibit C. This response was insufficient. The December 4, 2007 letter was a letter that was sent in *GMA Accessories v. Eminent et al.*, 07 CV 3219 (LTS) (DCF) (the "*Eminent* Case") (not this case) and vaguely refers to documents produced in the *GMA v. C. Ronson* TTAB proceeding and exhibits to filings in both the *Eminent* case and the *Ronson* opposition. Such vague disclosures are inadequate under the Federal Rules and the Court's March 5 Order.

12. In a letter to the Court, dated March 14, 2008, Ronson reiterated its request that GMA be ordered to submit a *separate pleading* setting forth with specificity the documents it refers to in its various letters and intends to rely on at trial.

13. On March 14, 2008, the parties had a discovery conference before the Court wherein the issue of GMA's Initial Disclosure was discussed. During the Court Conference the following discussion transpired, in which Mr. Bostany lied to the Court:

> Mr. Sacks: ... There have been many, many filings in the Ronson case, in the Ronson [TTAB] case.
>
> The Court: All right. So which exhibits to which filings?
>
> Mr. Bostany: But, Judge, I mean these are filings in a trial. You're allowed to --
>
> The Court: But realistically, in this -- realistically in Sanei, are you as part of your 26(a) disclosures --
>
> Mr. Bostany: **It's all fair game**. At a trial it's all fair game. It's been filed on the case in the clerk's office, and if you whip it out at trial, you can use it.
>
> The Court: That's not the question. The question is documents that you may use to support your claims or defenses. **Are you saying that you may use every filing, every exhibit in every filing in Eminent and in Ronson to support your claims or defenses in this case?**
>
> Mr. Bostany: **Obviously**, and more, and more. We would have filed them if they weren't germane.
>
> The Court: **He's saying all of them**.

\*\*\*

5

Mr. Sacks: Here's my problem, Your Honor ... If I go back to the office and we go through the filings in the TTAB proceeding, all of them, I'll bet you in an hour I could find a dozen of them that ... don't have anything to do with this litigation. And I believe that what Mr. Bostany is doing is just dumping another group of twenty or 30,000 documents on us that we will not know which documents he's really relying on.

\*\*\*

The Court: ... In the December 4 letter in the <u>Eminent</u> case where it says public documents, it says, "Exhibits to filings in both this case and Ronson." It doesn't say which exhibits.

\*\*\*

The Court: Well, I just asked you does this mean all exhibits to all filings, and you said absolutely yes.

\*\*\*

Mr. Sacks: And I think what we're doing is getting an ocean to look through.

Mr. Bostany: Then why would they have been filed in a trademark proceeding if they have no remote relevance to a federal trademark proceeding?

Mr. Sacks: Because there are different issues.

Mr. Bostany: I disagree.

Mr. Sacks: But if that's what Mr. Bostany is saying, and if he's represented that on the record, I will go and look in the TTAB proceedings. And if I believe that Mr. Bostany is relying on things, we'll come back to Your Honor.

\*\*\*

Mr. Sacks: I believe that this is a baseless Rule 26(a) disclosure.

The Court: Mr. Bostany? Mr. Bostany, the purpose of Rule 26(a), okay, is to take the key documents that you may be relying on in this case and make sure the other side has them even before discovery. It's not -- you know, it's not to dump a huge universe of documents that may have relevant stuff and may not have relevant stuff. It's to identify the documents you really may be using in this case that you now you really may be using in this case.

\*\*\*

6

The Court:   I do not know how many filings there were, how many exhibits there were to these filings, what the issues were, what the -- whether the issues are the same issues being raised here or are different issues that are being raised here. I don't know whether this is a document dump or this is not a document dump, but I will caution you, <u>I don't like document dumps.</u>

Mr. Bostany:   No, Judge.

The Court:   If it is not --

Mr. Bostany:   It's not.

The Court:   -- fine.

Mr. Bostany:   <u>It's not.</u>

The Court:   And we have your statement on the record. If it is, I'm sure I'll be hearing about it down the road. And Mr. Sacks will be coming in with examples of things that are exhibits to filings and will be putting it to you to say, why did you make me go look at this, this, this, and this, and you'll have to explain yourself.

     ***

The Court:   ... I'll tell you now, you have a choice. You can stick with your representation on the record that all of it you believe are documents you may be using in this case to support your claims or your defenses in this case.

Mr. Bostany:   Absolutely.

The Court:   Okay.

Mr. Bostany:   Absolutely.

The Court:   Fine. Or --

Mr. Bostany:   Absolutely.

The Court:   Okay. Or you can narrow it. If you --

     ***

The Court:   ... <u>If Mr. Sacks starts going through all those records and starts finding a whole bunch of things that seem to have no bearing on any issue in this case, it sounds like he may come back to me and he may put it to</u>

7

<u>you as to why you made him go through all of this</u>. And then I may be see -- hearing something about what ought to happen next. So, you know, be sure of what you say. You sound very sure of it. That's fine. You know, let's hope -- hopefully not it have come back. Think it through.

Mr. Bostany: Right. ... <u>The trademark office is about the validity of the Ronson mark. It is exactly on point to what's going on here</u>.

See March 14 Transcript, pgs. 68-75. True and correct copies of these pages are attached hereto as Exhibit D.

14. When Mr. Bostany made that statement about the TTAB documents, we -- and he -- knew that it was false. We have reviewed the filings in the TTAB proceeding. As we knew, there are a number of filings and exhibits in the Opposition Proceeding that have no bearing whatsoever on the *Sanei* Case totaling approximately 400 pages. For example, there were a number of Motions to Compel Discovery filed in the TTAB proceedings, which will have no bearing on the *Sanei* Case. Attached hereto as Exhibit E is a chart setting forth all of the documents and exhibits in the TTAB proceeding that are irrelevant to the *Sanei* Case, which total 397 pages. Attached hereto as Exhibit F is a chart setting forth all of the exhibits in the TTAB proceeding that are irrelevant to the *Sanei* Case, which total 297 pages.

15. Thus, it is clear that GMA's Rule 26 disclosures and Mr. Bostany's statements to the record amount to nothing more than a document dump. Mr. Bostany, The Bostany Firm and GMA should be sanctioned as a result.

**GMA'S DOCUMENT PRODUCTION**

16. In response to Ronson's document requests, interrogatories and requests for admissions, GMA supposedly produced 35,000 pages of documents as PDF files on 4 discs.[2] During a meet and confer, an attorney at The Bostany Firm, Ronald Paltrowitz, told Rob Grand,

---

[2] Although Ronson paid for 35,000 pages, we do not believe that 35,000 pages were actually produced. Since our firm is still sorting through the massive document production, we cannot state the exact number of pages that were produced to us at this time.

8

Mary Grieco and Safia Anand from my firm that the 35,000 documents would be easy to sort through because they were organized by year.

17. Moreover, during the March 14 Court Conference, Mr. Bostany made the same assertion and stated as follows: "Your Honor, the documents are Bates stamped. There's 35,000 sales orders. They are segregated in terms of year. **They all relate to Charlotte**. They show every single sale, every single product ... 2,000 are advert -- there's advertisements. There's cease and desist letters. They have all been segregated. They have all been segregated." *See* March 14 Transcript, pgs. 28-29. A true and correct copy of the relevant pages are attached hereto as Exhibit G.

18. We have several attorneys and a paralegal going through these 35,000 pages, page by page. I have been informed that the document production is nothing more than a document dump, produced in a disorganized and seemingly random manner. Warren Singh, our firm's Litigation Support Manager (who has been in charge of handling numerous litigation document productions) has told me that this is the worst document production he has ever seen in terms of its organization and our ability to be able to easily review and sort through the documents. *See* the accompanying Declaration of Warren Singh (the "Singh Declaration").

19. Pursuant to Rule 34(E)(i) of the Federal Rules of Civil Procedure, "[a] party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request." As set forth in more detail below, Mr. Bostany, GMA and The Bostany Firm are in violation of this rule, and similarly in violation of 28 U.S.C. § 1927. The document production is not labeled to correspond to the categories in the request and cannot by any stretch of the imagination reflect the manner in which GMA keeps its records in the normal course of business.

9

20. Below are some examples of the nature of the production:

- The document production is not segregated by year, as Mr. Paltrowitz and Mr. Bostany have stated. Indeed, there does not seem to be any rhyme or reason to the order of the documents and they jump around from year to year;

- <u>Not all of the documents relate to CHARLOTTE</u>. Indeed, a good number of them do not have <u>anything</u> to do with GMA's CHARLOTTE or CHARLOTTE & FRIENDS marks and thus are completely irrelevant;

- There are thousands of pages of emails going back and forth between Capelli and its customers discussing things like quantity of products, shipping details, delivery dates, etc. and make no reference to CHARLOTTE;

- There are thousands of pages of the same blurry photocopies of photographs of various products, all of which indicate "Capelli" and not "Charlotte";

- There are numerous duplicate documents in the production;

- There are hundreds of pages of nonresponsive computer printouts consisting of nothing but computerized symbols that are completely meaningless. There was no reason for GMA to produce these documents, and we are unable to publicly attach an example of these documents hereto as they were marked ATTORNEYS' EYES ONLY; however, an example of such a document will be sent to your Honor in a letter copied to Mr. Bostany.

10

- There are thousands of pages of bills of ladings, what appear to be packing lists, UCC documents and other shipping documents, which having nothing to do with the issues in the case and were not responsive to our document requests and interrogatories;
- There are gaps in the bates numbers for no apparent reason; and
- The documents are not in chronological order, but jump around from year to year and customer to customer with no logic to the bates numbering.

21. The production was completely disorganized and contains thousands of pages of documents that are unresponsive to Ronson's discovery requests and irrelevant to the issues in the case.

22. We have had to staff a number of attorneys and a paralegal on this project at great expense to our client in order to review these documents and attempt to make sense out of them. As set forth more fully in the Singh Declaration, because the documents were not copied in a manner that would have allowed them to be categorized and reviewed in an orderly manner, every page had to be printed out and reviewed by hand.

23. During the course of our meet and confers, we asked The Bostany Firm for very specific documents relating to their CHARLOTTE and CHARLOTTE & FRIENDS marks. We repeatedly told the attorneys at Mr. Bostany's firm that we were not interested in reviewing irrelevant documents, and we were looking at documents that showed the sales of Charlotte products such as invoices and the like; however, instead of complying with our requests, The Bostany Firm and GMA dumped 35,000 documents on us to sort through.

11

**GMA'S RESPONSES TO INTERROGATORIES**

24.  Moreover, in response to an interrogatory seeking the "generic" names of the products sold by GMA under the CHARLOTTE and CHARLOTTE & FRIENDS marks, GMA and Mr. Bostany have sworn that "the generic names for the products are identified in GMA's Trademark Applications and Registrations." *See* GMA Accessories, Inc.'s Supplemental Responses to Plaintiff's First Set of Interrogatories, ¶ 5(a), attached hereto as Exhibit H. **This is false. The generic names of the products are not identified in the applications and registrations**, and from a review of the documents, it is difficult to ascertain the generic names of the products. For instance, GMA's invoices show items listed as "ponys", "7" fairy kitten with bow-in shag fur w/ wearable accessory", "black groove HIB tatami" and many other examples. It is virtually impossible to determine the generic names of the products from the invoices or to match up these products with the supposed generic names listed in the applications and registrations. There are numerous examples of such discrepancies.

25.  Additionally, in response to Ronson's interrogatory to "Identify each product that has been, is being, or will be sold or offered for sale in connection with GMA's Charlotte Marks", GMA responded in a sworn response as follows: "The products are identified in GMA's Trademark Application and Registrations publicly available." *See* Exhibit H, ¶ 4.

26.  Furthermore, during the March 14 Conference, Mr. Bostany stated on the record that all of the products GMA has sold, is selling or will sell are coextensive with GMA's trademark registrations and applications. Specifically, the following discussion occurred with regard to Interrogatory number 4:

> The Court:   Where has he been informed of the products? Which letter informed him of the products?
>
> Mr. Bostany: I'm looking for it now, but it's a letter that says "Refer to our

registrations and you will see the products that we sell." Our registrations contain a list of the products.

The Court: Registrations contained don't ... if what your position is, our interrogatory answer is that all of the products that we have sold, are selling or will be sold or offered for sale is exactly coextensive with the list of products in the registrations, the registrations have been produced to you, their Bates Number is this and that, that's an answer.

Mr. Bostany: Yes. And the -- I'm sorry, and the applications which have also been --

The Court: Those are exactly coextensive. Those no one more here or one less there or anything? That's exactly it?

Mr. Bostany: That's what my client tells me. They haven't sold anything in addition to what has been identified in those documents that Mr. Sacks has.

Mr. Sacks: Your Honor, that would answer 4. It wouldn't answer 5. It wouldn't answer 6.

\*\*\*

The Court: All right ... **You have on the record today that the products that have been, are being -- I'm sorry, have been sold, are being sold, or will be sold or offered for sale in connection with GMA Charlotte marks are exactly coextensive with those that are listed in the registrations and the applications.**

\*\*\*

Mr. Bostany: Well, except I object to "will be sold," Judge. I will not preclude GMA from entering other areas tha tare not in the applications that are currently being filed.

\*\*\*

The Court: Well, then you have to otherwise answer the interrogatory or otherwise specifically object on some basis.

\*\*\*

The Court: Okay. All right. So you'll take what there is in their registrations and in the application. And Mr. Bostany, it's your representation that as of this time, that fairly represents what the company intends to sell as well as what it currently sells?

13

Mr. Bostany: Yes, Judge.

*See* March 14 Transcript, pgs. 34-39. True and correct copies of the relevant pages are attached hereto as Exhibit I.

27. <u>GMA's verified responses to Ronson's Interrogatories and Mr. Bostany's statements to the Court were false.</u> We have reviewed all of GMA's CHARLOTTE and CHARLOTTE & FRIENDS applications and registrations, as well as thousands of pages of documents from GMA's document production. Not only have we been unable to find sales of products listed in the registrations (which will be the subject of a separate motion once the document review is finished), but the majority of the goods that are sold by GMA that use CHARLOTTE or CHARLOTTE & FRIENDS hangtags or labels are not even covered by the registrations and/or applications.

28. For example, GMA has the following registrations for CHARLOTTE and CHARLOTTE & FRIENDS:

a. U.S. Registration No. 2,216,405, issued January 5, 1999, for the mark CHARLOTTE in International Class 26 for hair accessories, namely, hair clips, scrunchees, ribbons and braids.

b. U.S. Registration No. 2,217,341, issued January 12, 1999, for the mark CHARLOTTE in International Class 18 for sacks and bags, namely, handbags made of textiles and beads.

c. U.S. Registration No. 2,535,454, issued February 5, 2002, for the mark CHARLOTTE in International Class 25 clothing, footwear and headgear, namely hats, scarves, gloves and socks.

d. U.S. Registration No. 2,561,025, issued April 16, 2002, for the mark CHARLOTTE in International Class 9 for sunglasses.

e. Registration No. 3,242,358, issued May 15, 2007, for the mark CHARLOTTE in International Class 22 for bags for securing valuables; bands for wrapping or binding; belts, not of metal, for handling loads; fabric and polyester mesh net used for storing toys and other household items; garment bags for storage; mesh bags for storage; multi-purpose cloth bags; packaging bags of textile

material; rice straw bags (kamasu); shoe bags for storage; string.

f.  Use-based Application, filed June 30, 2006, for the mark CHARLOTTE in International Class 14 for the following goods: bonnet pins of precious metal; bracelets; bracelets of precious metal; brooches; buckles for watchstraps; charms ; chokers; costume jewelry; cuff-links; earrings; gemstones; gold and its alloys; hat pins of precious metal; iridium and its alloys; jewelry; jewelry for the head; jewelry pins for use on hats; lapel pins ; necklaces; ornamental pins; ornaments of precious metal; osmium and its alloys; pendants; picture frames of precious metal; platinum and its alloys; precious metal alloys; purses and wallets of precious metal; rhodium and its alloys; rings being jewelry; silver and its alloys; tiaras (Serial No. 78/921503).

g.  Use-based application, filed October 2, 2006, for the mark CHARLOTTE in International Class 24, for the following goods: Bath linen; Bath sheets; Bath towels; Beach towels; Bed blankets; Bed linen; Bed sheets; Bed spreads; Blanket throws; Chenille fabric; Children's blankets; Children's towels; Cloth coasters; Cloth napkins for removing make-up; Comforters; Contoured mattress covers; Cotton base mixed fabrics; Cotton fabric; Covered rubber yarn fabrics; Crepe cloth; Crib bumpers; Crib canopies; Curtain fabric; Curtain loops of textile material; Curtains; Curtains made of textile fabrics; Diaper changing mats; Diaper changing pads not of paper; Dining linens; Dish cloths; Draperies; Dust ruffles; Duvet covers; Duvets; Eiderdown covers; Eiderdowns; Fabric diaper stackers; Fabric flags; Fabric for boots and shoes; Fabric of imitation animal skin; Fabric table runners; Fabric table toppers; Fabric valances; Fabric window coverings and treatments, namely curtains, draperies, sheers, swags and valances; Face towels; Feather beds; Felt and non-woven textile fabrics; Fiberglass fabrics for textile use; Fireproof upholstery fabrics; Fitted toilet lid covers; Flannel; Flax fabrics; Frieze; Gauze fabric; Gift wrap of fabric; Hand towels; Hand-towels made of textile fabrics; Hemp base mixed fabrics; Hemp yarn fabrics; Household linen; Inorganic fiber mixed fabrics; Jeans fabric; Jersey fabrics for clothing; Jersey material; Jute fabrics; Kitchen linens; Kitchen towels; Knitted fabrics; Knitted fabrics of chemical-fiber yarn; Knitted fabrics of cotton yarn; Knitted fabrics of wool yarn; Labels of cloth; Lap rugs; Mixed fiber fabrics; Narrow woven fabrics; Net curtains; Nylon fabric; Oil cloths; Pillow cases; Pillow covers; Pillow shams; Pillowcases; Place mats of textile material; Polyester fabric; Pot holders; Puffs; Quilts; Ramie fabric; Rayon fabric; Receiving blankets. Regenerated fiber yarn fabrics; Rubberized cloths; Sackcloth; Sail cloth; Semi-synthetic fiber fabrics; Shams; Shower curtains; Silk-cotton mixed fabrics; Synthetic fiber fabrics; Table cloths not of paper; Table linen; Taffeta; Tapestries of textile; Terry towels; Textile fabric of animal skins imitations; Textile fabrics for home and commercial interiors; Textile fabrics for lingerie; Textile fabrics for the manufacture of clothing; Textile labels; Throws; Ticking fabric; Towel sets; Towels; Traced cloths for embroidery; Tricot quilts; Tulle; Unfitted fabric furniture covers; Upholstery fabrics; Velvet;

      Wash cloths; Washcloths; Washing gloves; Washing mitts; Window curtains; Wool base mixed fabrics; Wool yarn fabrics; Woolen fabric; Woolen blankets; Worsted fabrics; Woven fabrics; Zephyr fabric (Serial No. 77/012,104).

  h. U.S. Registration No. 2,412,362, issued December 12, 2000 for the mark CHARLOTTE & FRIENDS in International Class 3 for cosmetics, namely perfume, lip gloss, and hair lotions.

  i. U.S. Registration No. 2,412,360, issued December 12, 2000, for the mark CHARLOTTE & FRIENDS in International Class 25 for clothing, footwear and headgear, namely hats, scarves, gloves and socks.

  j. U.S. Registration No. 2,412,359, issued December 12, 2000 for the mark CHARLOTTE & FRIENDS in International Class 26 for hair accessories, namely hair clips, scrunchees, ribbons and braids.

  k. U.S. Registration No. 2,444,120, issued April 17, 2001 for the mark CHARLOTTE & FRIENDS in International Class 28 for toys, namely plush animals.

  l. U.S. Registration No. 2,682,145, issued February 4, 2003, for the mark CHARLOTTE & FRIENDS in International Class 9 for sunglasses

29. In reviewing the documents produced by GMA, we have noticed that many of the goods that GMA sells with the CHARLOTTE and/or CHARLOTTE & FRIENDS tags and labels are **not** set forth in its registrations and/or applications.[3] For example, GMA sells the following goods: Slippers, Flip Flops, Mufflers, Belts, Pajamas, Boas, Shirts, Headbands, Robes, Stoles, Wraps, Tights, Leggings, Shrugs, Tube Tops and Ponchos, among others. None of these goods are covered by the CHARLOTTE and/or CHARLOTTE & FRIENDS class 25 registrations, even though such goods are covered under class 25. Such examples are flagrant throughout the 35,000 documents. Thus, GMA's verified interrogatory responses are false and Mr. Bostany was dishonest with the Court during the Court Conference when he asserted that the registrations and applications contain a complete list of all the goods sold by GMA using the

---

[3] Additionally, as we suspected, GMA does not sell most of the goods set forth in its CHARLOTTE and CHARLOTTE & FRIENDS applications and/or registrations.

16

CHARLOTTE and CHARLOTTE & FRIENDS marks.

30. I certify that I and other attorneys from my firm have in good faith conferred with GMA's counsel in an effort to obtain a more relevant document production on numerous occasions and we have brought this issue to the Court's attention; however, GMA insisted on dumping 35,000 documents on Ronson claiming that they were all relevant and all about their CHARLOTTE marks. **<u>GMA's verified responses and Mr. Bostany's statements to the Court were false</u>**. As a result, Ronson has been forced to expend substantial time and money sifting through GMA's document dump to try to make sense of the production.

31. We cannot supply examples of the document production issues here since all of the GMA documents have been stamped as Attorney's Eyes Only and/or Highly Confidential under the Protective Order. We will, however, submit them to the Court under cover of letter, copied to opposing counsel.

32. Based on the foregoing, Ronson respectfully requests that Mr. Bostany, The Bostany Firm and GMA be sanctioned for their gross misconduct. The sanctions that should be assessed should be fashioned in light of Mr. Bostany's, his firm and GMA's prior misconduct. Mr. Bostany's behavior in this case is apparently typical of his behavior in other cases. This misconduct is described, for example, not only in Judge Ellis' opinion cited above, but also in *Playboy Enterprises, Int'l., Inc. v. On Line Entertainment, Inc.*, No. CV 00-6618 (DGT), 2004 WL 626807, at *6 (E.D.N.Y. April 1, 2004), where the Court discussed a previous admonition of defense counsel and told Mr. Bostany, in relevant part:

> What do you think, this is a stage? Do you think this is a stage? Do you think I gave you admonitions repeatedly, repeatedly, repeatedly because I don't mean them, because I am trying to make life difficult for you? Do you realize you have some responsibilities here? This is not Vaudeville, this is not stich, this is a court of law. If this happens again you will not be a member of this court of law. I am serious, this is not a game.

17

33. Given the nature of the relief sought, I respectfully submit that no supporting memorandum of law should be required.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 11, 2008
New York, New York

/s/ Ira S. Sacks
Ira S. Sacks