# EXHIBIT M

Westlaw.

5/10/2000 NYLJ 39, (col. 1)                                                    Page 1
5/10/2000 N.Y.L.J. 39, (col. 1)

New York Law Journal
Volume 223, Number 90
© 2000 NLP IP Company

Wednesday, May 10, 2000
Court Decisions
Second Judicial Department
U.S. District Court: S.D.N.Y.

Judge Ellis

[Footnotes Deleted for Publication]
GMA ACCESSORIES, INC. V. POSITIVE IMPRESSIONS, INC. QDS:02762414

## I. Introduction

This matter was referred by the Honorable Whitman Knapp on November 4, 1998, for general pretrial supervision and resolution of dispositive motions. On October 21, 1999, defendant Gootnick Enterprises, d/b/a It's All Greek to Me ("Greek"), submitted a motion for sanctions against plaintiff GMA Accessories, Inc., ("GMA") for noncompliance with discovery and destruction of evidence, pursuant to Rule 37 of the Federal Rules of Evidence. After conducting an evidentiary hearing on the matter on February 17, 2000, and for the following reasons, the Court GRANTS Greek's motion for sanctions and the plaintiff shall pay all of Greek's reasonable expenses incurred in securing the discovery sought, plus an additional $10,000. Additionally, the Court orders John Bostany, counsel for GMA, to pay $5,000 as a sanction for his misrepresentations to the Court and tactical maneuvering.

## II. Background

This case involves particularly contentious counsel with an affinity for protracted motion practice. For purposes of this motion, the tortured procedural history has been distilled to these essential facts. On May 22, 1998, plaintiff GMA filed a complaint alleging trademark infringement in violation of the Lanham Act, 15 U.S.C. §1115(b), regarding the use of plaintiff's trademarked phrase "Floppy Friends" in connection with Greek's manufacturing, sale and distribution of soft plush toys. On September 1, 1998, Greek served document requests on GMA seeking production of sale invoices of the product "Floppy Friends." See Def. Mem. at 2. In its response to Greek's request for production of documents, GMA refused to produce any invoices, objecting to the request as being "privileged, unlikely to lead to discoverable evidence, irrelevant and immaterial to the claims asserted by the plaintiff." Def. Mem., Exh. 3 at 4. A pretrial conference was held before the

Copyright © 2008 The New York Law Pub. Co.

5/10/2000 NYLJ 39, (col. 1)
5/10/2000 N.Y.L.J. 39, (col. 1)

Page 2

Court on April 16, 1999, whereby the Court found the discovery to be relevant and ordered GMA to produce the sale invoices. See Def. Mem., Exh. 4 at 62. The Court followed this oral ruling with a written Order, ordering production by May 3, 1999. See 4/20/99 Order. GMA failed to comply with this Order by not producing the invoices to Greek. In response to this failure, the Court directed GMA to show cause why sanctions should not be imposed on them pursuant to Rule 37 (b) and (d) of the Federal Rules of Civil Procedure. See 5/7/99 Order.

### A. Failed Inspection of the Invoices

In response to the Show Cause Order, GMA filed a response, stating that Greek "may inspect plaintiff's invoices at its warehouse in New Jersey within the next 30 days at a date to be proposed by defense counsel." See Def. Mem., Exh. 8 at 3. The inspection of the documents was scheduled to take place on July 1, 1999, at 2:00 p.m., and on July 6, 1999, at 12:00 p.m. See Def. Mem., Exh. 9.

What transpired on July 1, 1999, is contested between the parties. Greek filed a motion to dismiss the case for noncompliance with discovery and destruction of evidence on October 21, 1999. In its submissions, Greek maintains that on July 1st at 2:00 p.m., a representative of Greek, a paralegal named Eric Whitman, went to Secaucus, New Jersey, to conduct the scheduled inspection. See Def. Let. at 3. When Whitman arrived at the warehouse, the warehouse manager, named "Mike," told him that "no one had advised him that anyone was coming to inspect any documents on that date and further, that all such records were kept at the office of the comptroller in New York City." See Whitman Aff. at 3. Subsequently, Whitman was denied access to the GMA warehouse and the discovery inspection did not take place on July 1, 1999. On July 13, 1999, Greek sent a letter to GMA, stating that it was not allowed access to the documents for inspection on July 1st, and requesting that the documents be copied and sent to Greek. See Def. Mem., Exh. 10.

In response to the motion to dismiss, GMA maintains a different version of events in direct contravention to Greek's account. First, John Bostany, counsel for GMA, by way of letter to this Court, called into question the veracity of Whitman's account, stating Greek "wants us to believe that on July 1st his paralegal visited GMA for an inspection of documents, spoke to someone named 'Mike' and then just turned around and went back to New York ... ." See 10/25/99 Pl. Let. Subsequently, by way of affidavit, Bostany again questioned the truthfulness of Greek's contention that Whitman attempted the inspection, by stating "Whitman claims that he spoke to a person named 'Mike' and never asked for" the person responsible for the document production, William Maloof. See Bostany Aff. at 11. In support, plaintiff provided an affidavit of Maloof, the Chief Executive Officer of GMA, who stated:

On July 1 and July 6, 1999, I was present at the Secaucus warehouse prepared to allow the attorneys for the defendant in this case to inspect all of our purchase orders and invoices pertaining to Floppy Friends. On neither of those dates did the attorneys for the defendant arrive for an inspection.

Copyright © 2008 The New York Law Pub. Co.

5/10/2000 NYLJ 39, (col. I)
5/10/2000 N.Y.L.J. 39, (col. I)

Page 3

Maloof Aff. at 3.

Additionally, Bostany pointed to the fact that the car service voucher of Whit-
man's alleged attempt indicated that he traveled to 231 Secaucus Road, not 245 Se-
caucus Road, which is where the warehouse is located. See Bostany Aff., 10. GMA
further contended that the motion should be denied because Greek has refused to
cooperate by taking its invitation to schedule a further inspection, or agree to
copying of the documents at Greek's expense. See id. at 12; Pl. Cross Mot. at 7.

### B. Spoilation of Evidence
Greek also argues that GMA has destroyed key evidence in this case by intention-
ally discarding the invoices pertaining to one of the products, the Floppy Friends
"moose." Greek points to Bostany's representation to Magistrate Judge Pisano in
the District of New Jersey, by which he asserts that "GMA moved its records to its
corporate office in Secaucus, New Jersey earlier this year and in the process dis-
carded all old (pre-1998) purchase orders and invoices." See Def. Mem., Exh. 21 at
2. Greek maintains that it was this disclosure of spoilation of evidence that
prompted this aspect of the instant motion.

In response to the instant motion, Bostany represented to this Court that "[n]one
of those invoices or purchase orders were destroyed as defense counsel suggests."
10/25/99 Pl. Let. at 1.

### C. Default on Court Ordered Deposition
Greek served a notice for the deposition of Maloof on September 24, 1998. The de-
position did not take place, and again, the surrounding circumstances are con-
tested between the parties. On April 20, 1999, by way of written order, this Court
ordered GMA to comply with Greek's notice of deposition for Maloof, and ordered
GMA to schedule a date for the deposition to take place. See 4/20/99 Order. After
several scheduling problems, the deposition was scheduled for July 13, 1999.
However, Maloof did not appear on this date, and a default appearance was noted on
the record. See Def. Mem., Exh. 27. GMA did send a facsimile to Greek the evening
before the scheduled deposition, on July 12, 1999, by which GMA indicated that
Greek had canceled the Maloof deposition. See id. at Exh. 26. It appears from the
record that Greek canceled two other depositions which were scheduled for July 8th
and 9th, which Greek informed GMA by facsimile dated July 7th. See id. at Exh. 25.

In response to this motion, GMA filed a cross motion for fees and costs pursuant
to 28 U.S.C. §1927 for "vexatiously and frivolously increasing the costs of pro-
secuting this trademark infringement action." See Pl. Cross Mot.

### III. FINDINGS OF THE EVIDENTIARY HEARING
The Court held an evidentiary hearing on this matter on February 17, 2000. A sum-

Copyright © 2008 The New York Law Pub. Co.

5/10/2000 NYLJ 39, (col. 1)                                                    Page 4
5/10/2000 N.Y.L.J. 39, (col. 1)

mary of each parties testimony is as follows.

### A. Greek's Version

For Greek, Whitman testified that he first went to 245 Secaucus Road, and was
greeted by a secretary, whom he showed a business card. See Tr. at 34-35. After
informing her that he was here to do a document inspection, the secretary told him
to go to 231 Secaucus Road and ask for the warehouse manager, "Mike." See id. At
the 231 Secaucus Road location, Whitman spoke to a person who identified himself
as "Mike," and informed him that he was there to inspect purchase orders and in-
voices in the "GMA Accessories versus It's Greek to Me" matter, which was to have
been arranged for this date and time by Bostany. Id. at 38. The warehouse manager,
Mike, informed Whitman that he knew of no such inspection, that "the documents
were not at the Secaucus warehouse location, they were in fact under the control
of Mr. Maloof in a downtown New York City location." Id. Whitman proceeded to
leave, without having completed the inspection.

### B. GMA's Version

For GMA, Maloof testified that he was available and ready to assist defendant in
the inspection, but no one came to the warehouse at 245 Secaucus Road to inspect
the documents. See id. at 54. Additionally, Masoud Altirs, who admitted that he
uses the name "Mike," testified for GMA that he is the Vice-President of GMA, and
that he had not been advised that someone would be inspecting documents. Altirs
also testified that a man, later identified as Whitman, did come to the warehouse,
asked for him and stated that he "was here to for the inspection." Id. at 78.
Altirs stated that Whitman did not give him his name, did not say where he was
from, would not give him a business card, and left quickly. Id.

Also significant to GMA's presentation of evidence was the unannounced delivery
of several large boxes, delivered to the courtroom in the midst of the evidentiary
hearing. GMA represented that the boxes contained the invoices at issue, which
were copied by "plaintiff at its own expense ... of over $5,000 for almost 30,000
documents ... ." Pl. Mem. at 7. The Court finds this significant given the previ-
ous position taken by GMA, that the production was "overly burdensome," and in-
spection of the documents was the only means by which the discovery was made ac-
cessible to the defendant. The Court also notes that GMA offered to copy the dis-
covery at issue only after the filing of the motion to dismiss, and made the offer
by way of several facsimiles to defendant. See Pl. Mem., Exh. C.

Regarding the "moose" invoices, Maloof testified to the Court that these invoices
were "lost" in transit between New York and New Jersey. See Tr. at 69.

### C. Conclusion

Based on the evidence at the hearing and the submitted affidavits, the Court

Copyright © 2008 The New York Law Pub. Co.

5/10/2000 NYLJ 39, (col. 1)
5/10/2000 N.Y.L.J. 39, (col. 1)

finds the testimony of Whitman to be credible, that he went to the appropriate
site, properly identified himself, and was told that the inspection would not take
place. The Court finds that Whitman was affirmatively misled when he was sent from
the 245 location to the 231 location and when he was told that the documents were
under Maloof's control in New York City. The Court finds that it is not credible,
given the history of this case, that the only person at the site who was expecting
an inspection was Maloof. The Court specifically discredits the testimony that the
person in charge of the warehouse was not told and that the receptionist was not
alerted to the arrival of anyone with respect to the inspection. However, even if
the Court were to fully credit Maloof's testimony, he did nothing to facilitate
the inspection. This was an insufficient response to the Court's Order on inspec-
tion. The Court is left with the unmistakable impression that neither GMA nor
Bostany was seriously interested in complying with the discovery request or the
Court's Order. Given this willful behavior and the history of this case, the Court
finds sanctions appropriate in this case. The Court will thus consider the appro-
priate sanction for this noncompliant behavior.

## IV. DISCUSSION OF SANCTIONS

Rule 37 of the Federal Rules of Civil Procedure provides, in relevant part:

If a party ... fails to obey an order to provide or permit discovery, ... the
court in which the action is pending may make such orders in regard to the failure
as are just, and among others the following:

An order ... dismissing the action or proceeding or any part thereof, or ren-
dering a judgment by default against the disobedient party.

In lieu of any of the foregoing orders or in addition thereto, the court shall
require the party failing to obey the order ... to pay the reasonable expenses,
including attorney's fees caused by the failure, unless the court finds that the
failure was substantially justified or that other circumstances make an aware of
expenses unjust.

Fed. R. Civ. P. 37(b)(2).

Orders of dismissal or default are the "[h]arshest of all" sanctions available
under the rule, see, e.g., Cine Forty-Second St. Theatre Corp. v. Allied Artists
Pictures Corp., 602 F.2d 1062, 1066 (2d Cir. 1979), and are to be used only after
(1) the court finds willfulness, bad faith, or fault in the course of discovery
and (2) the court gives notice that violation of the court's order will result in
a dismissal of the case with prejudice. See Simmons II v. Abruzzo, 49 F.3d 83, 88
(2d Cir. 1995). While dismissal and default are extreme remedies, "in this day of
burgeoning, costly and protracted litigation, courts should not shrink from impos-
ing harsh sanctions where ... they are clearly warranted." Jones v. Niagara Fron-
tier Transp. Auth., 836 F.2d 731, 731 (2d Cir. 1987). The Second Circuit has

Copyright © 2008 The New York Law Pub. Co.

5/10/2000 NYLJ 39, (col. 1)
5/10/2000 N.Y.L.J. 39, (col. 1)

warned, "a party who flouts [discovery] orders does so at his own peril." Sieck v. Russo, 869 F.2d 131, 133 (2d Cir. 1989) (quoting Update Art, Inc. v. Modiin Publishing, Ltd., 843 F.2d 67, 73 (2d Cir. 1988)).

In American Cash Card Corp. v. AT&T, 184 F.R.D. 521 (S.D.N.Y. 1999), the court outlined six factors to consider when contemplating the imposition of the litigation-ending sanction for discovery abuse:

(a) willfulness or bad faith on the part of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party had been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party.

Id. at 524. The deciding court should also balance "the need for general deterrence and docket control" and "the preference for resolving cases on their merits." Id. With these guidelines, the Court will examine GMA's conduct in discovery.

A. Willfulness or Bad Faith; the History of Noncompliance
GMA's disobedience has been willful, as demonstrated by: (1) its repeated failure to comply with the Court's orders to supply defendant with the invoices at issue; (2) its obvious distortion of the facts in its submissions prior to the hearing surrounding Greek's investigation attempt; (3) its distortion to the courts in differing submissions regarding the "moose" invoices; and (4) its tactic of surprise unloading of the documents at the evidentiary hearing.

First, GMA was ordered by the Court to produce the invoices orally on April 16, 1999, and by written order on May 3, 1999. When GMA failed to do so, the Court issued a Show Cause Order on May 7, 1999. Following a conference with the parties, GMA agreed to allow an inspection by June 12, 1999, at a date proposed by Greek. At this point, GMA was on notice of the possibility of sanctions. The Court expected that GMA, having previously been ordered to produce the invoices, would take the necessary steps to insure they were available to defendant. This would include notifying appropriate personnel of plaintiff when and where the inspection was to occur and making sure that such personnel were available and prepared to assist so that the inspection went smoothly. It is obvious from the facts presented that at best GMA took a passive approach to the inspection. Given the Court's previous order to produce the subject invoices, GMA's behavior constitutes willful noncompliance.

More disturbing to the Court, however, is the behavior of GMA's counsel, John Bostany. Combining the talents of an old carnival huckster and an ancient Greek sophist, Bostany has undertaken to impose upon the Court a kind of shell game, using language to misdirect and mislead, until finally delivering the invoices to the courtroom. This dramatic flourish might be appropriate for Madison Square

Copyright © 2008 The New York Law Pub. Co.

5/10/2000 NYLJ 39, (col. 1)
5/10/2000 N.Y.L.J. 39, (col. 1)

Garden, but not the Southern District of New York.

An examination of Bostany's submissions shows the continual pattern of deception.

1. Whitman's Visit to Secaucus

a. What GMA and Bostany Said

In Bostany's letter to the Court dated October 25, 1999, he states that Greek "wants us to believe that on July 1st his paralegal visited GMA for an inspection of documents, spoke to someone named 'Mike.' " 10/25/99 Pl. Let. In his affidavit dated December 13, 1999, Bostany states that "Whitman claims that he spoke to a person named 'Mike.'" Bostany Aff. at 11. In his affidavit dated November 3, 1999, William Maloof, the CEO of GMA stated that "on neither of those dates did the attorneys for the defendant arrive for an inspection." Maloof Aff. at 3.

b. Impressions Conveyed

These factual assertions and sworn statements suggest that: (1) no one named Mike works for GMA; and (2) no one appeared for defendant for the scheduled inspection.

c. The Truth

During the evidentiary hearing held on February 17, 2000, it was established that: (1) "Mike" is the name commonly used for Masoud Altirs, vice-president and warehouse manager for GMA; and (2) although he was not an "attorney," Eric Whitman, a paralegal employed by the attorneys for Greek, did appear, did talk to Altirs, and did indicate that he was there for an "inspection."

2. The Warehouse Address

a. What GMA and Bostany Said

In response to defendant's motion for sanctions, Bostany affirmed that "defense counsel annexed a copy of a voucher supposedly utilized by defense counsel's paralegal, Eric Whitman to arrive at the Secaucus' warehouse. The car service voucher, annexed hereto as Exhibit B, indicates that Mr. Whitman traveled to 231 Secaucus Road to conduct an inspection. Yet, the plaintiff's warehouse is located at 245 Secaucus Road." Bostany Aff. at 10. Bostany also makes the sworn statement that "[Whitman] allegedly arrived at 231 Secaucus Road and spoke to an individual named 'Mike.'" Id. at 11.

b. Impressions Conveyed

Bostany's sworn statements suggest that Whitman went to the wrong address and that this might explain the failed inspection.

c. The Truth

Copyright © 2008 The New York Law Pub. Co.

At the evidentiary hearing, it was established that both addresses belong to GMA and are merely separate entrances to a large building. In any case, Whitman appeared at both addresses on the scheduled day.

3. The Invoices for the "Moose" Floppy Friend

a. What GMA and Bostany Said

Bostany represented to Magistrate Judge Pisano in the District of New Jersey that "GMA moved its records to its corporate office in Secaucus, New Jersey earlier this year and in the process discarded all old (pre-1998) purchase orders and invoices." See Def. Mem., Exh. 21 at 2 (emphasis added). At the time of this disclosure on October 14, 1999, an Order from this Court was in effect requiring the discovery of invoices to be given by May 3, 1999. Included in this discovery would be the moose design, as it is a "Floppy Friend." Then, Bostany later retracted that statement, by stating to this Court that "[n]one of those invoices or purchase orders were destroyed as defense counsel suggests." 10/25/99 Pl. Let.

b. Impressions Conveyed

Based on the first assertion, it appeared that all invoices had been discarded. However, Bostany's later affirmation conveyed to the Court that GMA had not discarded any invoices, and therefore, the invoices were available for discovery purposes.

c. The Truth

At the evidentiary hearing, it was established that the "moose" invoices were indeed "lost," but the others were still in GMA's possession.

No statement, on its own and on its face, can be said to be an explicit lie by Bostany. However, counsel continually made statements to the Court regarding these incidents were designed to leave the Court with false impressions, when GMA and Bostany knew facts which contradicted these impressions. Calculated deception to the Court to this degree is not tolerable and is sanctionable.

To compound his transgression, without requesting permission or otherwise informing the Court or defendant, Bostany had a third party deliver multiple storage boxes of documents to the courthouse while testimony was being taken on defendant's motion. While Bostany contends this display exhibits GMA's good faith, the Court views it as a calculated stunt to sidetrack the issue of defendant's motion for sanctions in the midst of the presentment of evidence. Additionally, it underscores the relative ease with which this evidence could have been delivered to defendant, but was not. Throughout these discovery disputes, plaintiff has maintained that it was extremely burdensome to identify and/or copy the invoices. Even after this Court's Order to Show Cause of May 7, 1999, GMA kept up this mantra of burdensomeness at a conference before the Court. It therefore agreed to allow an

Copyright © 2008 The New York Law Pub. Co.

inspection within "30 days." Despite these protestations, once GMA ascertained
that the Court would actually hear the motion for sanctions, including dismissal,
it somehow found the wherewithal to identify, copy, and deliver the invoices to
the courtroom in a relatively short time period.

### B. Client's complicity

Another factor that weighs in favor of imposing sanctions against GMA is the cli-
ent's complicity. It is clear that GMA itself must share responsibility for the
discovery failure herein. The testimony of two of the principals, Maloof and
Altirs, makes clear that they were, at best, negligent in their response to the
Court's Order to produce the invoices. Maloof, the chief executive officer, testi-
fied that he did not tell anyone at the Secaucus warehouse that someone was coming
to inspect documents on July 1st, even though he could not continuously view the
reception area from his office, and therefore was not able to see everyone who
entered the premises. See Tr. at 75-76. Given the history of noncompliance in this
case, such a cavalier approach to discovery would in itself be sanctionable. The
Court, however, finds that Maloof's behavior consisted of more than mere negli-
gence. It is simply not credible that a major discovery endeavor was not communic-
ated to other personnel, including the custodian of the records. Maloof compounded
his malfeasance by submitting an affidavit indicating that no "attorneys" arrived
for inspection. This statement was obviously designed to mislead the Court.

The Court also finds not credible Altir's testimony that he was unaware of the
inspection. It borders on ludicrous to suggest that he believed this "inspection"
was for inspection of the warehouse lights, as suggested at the evidentiary hear-
ing. See Tr. at 81.

For these reasons, the Court finds that plaintiff, through its officers, shared
in the knowledge of the nonproduction of the subject invoices.

### C. Prejudice to the Moving Party

Another factor weighing in favor of severe sanctions is that Greek has been pre-
judiced by GMA's nonproduction of discovery. Greek first sought the invoices on
September 1, 1998. Now, more than eighteen months later, GMA dumps the files at
the hearing on sanctions. Greek has had to devote extensive time and resources in
trying to obtain the discovery at issue and the development of the case has been
delayed.

### D. Effectiveness of Lesser Sanctions; Warnings about the Possibility of Sanctions

In response to the motion, GMA denies that it violated an explicit court order,
arguing that "defendant does not point to any order that was entered that required
the plaintiff to produce its invoices in any fashion different than the way the

Copyright © 2008 The New York Law Pub. Co.

plaintiff went about producing them." Pl. Mem. at 7-8. The Court does not accept
this argument. At the April 16th conference, the Court ordered GMA to produce the
invoices. This oral ruling was following by a written order, dated April 20, 1999.
The May 7th Show Cause Order further mandated compliance by GMA to produce the or-
ders. The fact that GMA and Greek agreed to an inspection of the documents, as op-
posed to photocopying them, does not excuse GMA from its obligation to produce the
documents in some form. GMA argues that it is not responsible for the failed in-
spection "because the defendant did not ask for Maloof when its agents arrived at
the warehouse." Id. at 4. As outlined above, the Court does not find this argument
persuasive and holds GMA responsible for its failure to ensure the production of
the discovery.

GMA further argues that Greek has not been "seriously prejudiced" by the discov-
ery violation. The Court disagrees. A one and a half year delay in receiving the
invoices is prejudicial. Moreover, Greek has had to spend considerable time and
expense bringing this violation before the Court. GMA's eleventh hour delivery at
the courthouse only serves to underscore the ease of which the discovery could
have been produced, but was not.

Lastly, GMA argues that Greek failed to follow the proper procedure in resolving
the dispute before making motions to the Court. GMA believes Greek's motion for
sanctions was "unripe and malicious." See Pl. Resp. at 6. It relies on a recent
decision of this Court, A.I.A. Holding S.A. v. Lehman Brothers, Inc., 2000 WL
98315 (S.D.N.Y. Jan. 26, 2000), for the legal principle that parties must meet and
confer prior to making motions to the Court. In A.I.A. Holding S.A., the defendant
moved for sanctions for discovery abuse and this Court found that, while abuse did
occur in the case of one of the plaintiffs in the class, defendants should be ad-
monished, and should not benefit from their exceedingly protracted motion prac-
tice. See id. Such is not the case here. Here, Greek has been seeking discovery
compliance for more than one year. Each time Greek has agreed to modify its posi-
tion to obtain the discovery to which it is entitled. The Court finds that GMA has
made it clear that its agreements to cooperate were specious and designed only to
delay.

While GMA has not been subjected to sanctions in the traditional sense, its con-
tumacious behavior has resulted in actions by the Court which acted as penalties
for wrongful behavior. First, in November of 1998, Judge Knapp vacated the prelim-
inary injunction in this case, when GMA failed to return customer lists to defend-
ant. Second, in December of 1998, GMA was directed by this Court to notify 1,100
customers that they need not respond to the Amended Complaint because GMA used the
customer list improperly. Next, in January of 1999, GMA's attempt to join these
same customers as defendants was denied by this Court.

Moreover, GMA has engaged in the practice of brinkmanship, waiting until the last
minute and then agreeing to a course of action to avoid sanctions. At the same
time, GMA has filed numerous motions seeking sanctions against defendants, dis-

Copyright © 2008 The New York Law Pub. Co.

tracting both the Court and defendant. The net result is that the Court has not had the opportunity to gauge the effectiveness of sanctions less than dismissal.

In sum, sanctions against GMA are warranted. On this record, the Court does not find that the extreme measure of dismissal is called for. However, GMA has flouted its obligations and under such circumstances, an intermediate sanction is warranted. The Court considers GMA's noncompliance a continuing violation. Otherwise, GMA will be rewarded for last minute agreements which avoid sanctions, but only serve to delay production of the relevant documents. Because Greek had to bring the motion on more than one occasion, all of its efforts will be considered together. Greek is specifically not required to pay for any copying costs associated with the boxes delivered to the Court and may take possession of such boxes upon notice to the Court. The cost of retrieving and transporting the boxes shall be added to their costs associated with this motion. GMA will pay all of Greek's reasonable expenses incurred in seeking to have GMA produce the "Floppy Friends" invoices, and an additional $10,000. This specifically includes all letter requests and appearances at discovery conferences before the Court. Moreover, for his deception to the Court, effective "road-blocking" to this case, and tactical maneuvering regarding the boxes of discovery, the Court orders Bostany to pay $5,000 in sanctions. Bostany is also ordered to turnover to Greek any and all customer lists in its possession or being held by John W. Johnson.

Greek shall submit a summary of expenses and attorney's fees incurred in its attempt to procure the invoices.

### V. Conclusion

For the reasons stated, defendants' motion for sanctions is GRANTED. GMA shall pay all of defendant's reasonable attorney's fees and expenses incurred in attempting to secure production of the "Floppy Friends" invoices, plus an additional $10,000. Additionally, the Court orders Bostany to pay $5,000 as a sanction for his misrepresentations to the Court and tactical maneuvering.

So Ordered.

5/10/2000 NYLJ 39, (col. 1)

END OF DOCUMENT

Copyright © 2008 The New York Law Pub. Co.

# EXHIBIT N

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 626807 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 626807)

**H**

Playboy Enterprises Intern., Inc. v. On Line Enter-
tainment, Inc.
E.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
PLAYBOY ENTERPRISES INTERNATIONAL,
INC., Playboy Entertainment Group, Inc. and Play-
boy.Com, Inc., Plaintiffs,
v.
ON LINE ENTERTAINMENT, INC. and Mario
Cavalluzzo, Defendants.
Civil Action No. CV 00-6618(DGT).

March 29, 2004.
As Amended April 1, 2004.

Joseph Christopher Gioconda, Kirkland & Ellis,
New York, NY, for Plaintiffs/Counter Defendants.
John Peter Bostany, New York, NY, for Defend-
ants/Counter Claimant.

*MEMORANDUM AND ORDER*

TRAGER, J.

### Background

*1 The plaintiffs in this action are Playboy Enter-
prises International, Inc. ("PEII"), Playboy Enter-
tainment Group, Inc. ("PEGI") and Playboy.com
(collectively "plaintiffs"). PEII is a Delaware cor-
poration with its principal place of business located
in Chicago, Illinois. PEII is an international multi-
media entertainment company that publishes *Play-
boy* magazine. PEGI is a Delaware corporation and
is a wholly owned subsidiary of PEII. Playboy.com
is a Delaware corporation and is a wholly owned
subsidiary of PEII. The defendants are On Line En-
tertainment, Inc. ("OLE") and Mario Cavalluzzo
("Cavalluzzo") (collectively "defendants"). OLE is
a New York corporation with its principal place of
business located in Elmont, New York. Cavalluzzo
is a citizen of the State of New York residing with-
in the Eastern District of New York who directs and

controls the business activities of OLE.

PEII through its wholly owned subsidiary, PEGI, is
the producer of a cable television series entitled
"Sex Court," which airs on the subscription televi-
sion services "Playboy TV," which is broadcast in
the United States, and "Playboy TV Networks,"
which is broadcast internationally. PEGI is also the
producer of a video cassette compilation bearing
the Sex Court mark, which is distributed for sale
throughout the United States and internationally via
the < playboy.com> web site, which is owned and
operated by plaintiff Playboy.com.

In their complaint, plaintiffs alleged that defendants
have sought improperly to profit from Playboy's in-
vestment in marketing the Sex Court trademark.
Plaintiffs claimed that OLE registered the Internet
domain name <sexcourt.com> after the Sex Court
series became popular and the name and mark Sex
Court became associated in the public mind with
plaintiffs' television series. Plaintiffs further alleged
that defendants began using and continued to use
the <sexcourt.com> domain name in connection
with an Internet Web site that is, in fact, unrelated
to Playboy or the Sex Court series, but attempted to
convey to Internet users that it is connected to the
television series. Plaintiffs suggested that defend-
ants attempted to lure Internet users seeking in-
formation about the Sex Court television show and
to then entice users to link to sexually explicit com-
mercial Internet sites that charge subscription fees
for access to their contents. Thus, plaintiffs alleged
that "defendants seek simultaneously to trade off of
the goodwill the SEX COURT mark has come to
enjoy among consumers, and to reduce the value of
that goodwill by improperly associating that name
with services from unrelated sources."Complaint, ¶
8. The action resulted in the commencement of a
jury trial in this district on April 7, 2003.

On April 9, 2003, prior to the conclusion of the jury
trial, defendants entered into a Settlement Agree-
ment ("April 9 settlement agreement") with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 626807 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 626807)

plaintiffs. That same day, both parties' counsel presented and affirmed an accompanying Permanent Injunction Upon Consent Against Defendants to the court. The injunction was signed by counsel for both parties, and was entered by the court on April 10. On April 16, defendants served upon plaintiffs a Notice of Motion requesting "an Order (1) setting aside the April 9, 2003 settlement agreement; (2) vacating the April 10 consent injunction and judgment; and (3) setting a date for a new trial, in the interest of justice, on the basis of mistake, duress, misrepresentation and fraud."On April 21, plaintiffs submitted a cross-motion by letter requesting that the docket entries be sealed. On April 23, plaintiffs submitted a cross-motion for an order to show cause requesting that the court enforce the Permanent Injunction and Settlement Agreement by: (1) ordering Mr. Cavalluzzo to immediately deliver all rights, passwords and title to the <www.sexcourt.com> and <www. pamelaandersonlee.net> domain names to Playboy; and (2) to pay Playboy's costs and attorneys' fees associated with the preparation of the papers related to the cross motion. Memorandum of Law in Support of Playboy's Motion for an Order to Show Cause ("Pl. Mem. of Law for OSC") 1-2.

## Discussion

### (1)

### Motion to Set Aside Settlement, Vacate Consent Judgment and Order a New Trial

**\*2** Defendants' Memorandum of Law is limited to conclusory statements, general statements of law, and appeals to the "interests of justice," yet fails to advance clearly delineated legal arguments. Defendants' brief states that "[a] settlement agreement should be set aside if it is induced by fraud, collusion, mistake, accident, intimidation, coercion or duress."Memorandum of Law in Support of Counterclaimants' Motion to Set Aside April 9 Settle-

ment ("Def. Mem. of Law") 1. The cases cited by defendants in support of this assertion state that settlement agreements must be construed under general principles of contract law. *See, e.g. Downes v. O'Connell,* 103 F.Supp.2d 579, 582 (E.D.N.Y.2000) ("Settlement agreements are contracts and must therefore be construed according to general principles of contract law."); *see also Willgerodt v. Hohri,* 953 F.Supp. 557, 561 (S.D.N.Y.1997); *Hest v. New Amsterdam Casualty,* 268 F.Supp. 623 (D.S.C.1967). Accordingly, defendants request "that the settlement agreement be set aside due to mistake, misrepresentation, duress and Playboy's fraudulent use of the [March] consent injunction ... to induce settlement."Def. Mem. of Law 4.

Defendants are correct that a settlement agreement should be construed as a contract. *See Goldman v. Commissioner,* 39 F.3d 402, 405 (2d Cir.1994) (holding that a "settlement agreement constituted a contract" and that "general principles of contract law must govern its interpretation."); *Torres v. Walker,* 356 F.3d 238, 245 (2d Cir.2004) ("Settlement agreements are contracts and must therefore be construed according to general principles of contract law.") (quoting *Red Ball Interior Demolition Corp. v. Palmadessa,* 173 F.3d 481, 484 (2d Cir.1999)). The April settlement agreement contains a choice of law provision stating that the "Agreement shall be governed by, and construed and interpreted in accordance with, the substantive laws of the State of New York, without regard to conflicts or choice of law principles."Gioconda Decl. Ex. A (April settlement agreement) ¶ 18. Thus, New York contract law governs.[FN1]Under New York law, "[o]nly where there is cause sufficient to invalidate a contract, such as fraud, collusion, mistake or accident, will a party be relieved from the consequences of a stipulation made during litigation."*Hallock v. State,* 64 N.Y.2d 224, 230, 474 N.E.2d 1178, 485 N.Y.S.2d 510 (N.Y.1984); *see also Downes,* 103 F.Supp.2d at 582 ("The court will set aside or modify the terms of a settlement reached in open court only upon a showing of good cause, such as fraud, collusion, mistake, accident,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 626807 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 626807)

Page 3

or lack of authority.").

> FN1. Although the Second Circuit has repeatedly applied local contract law when construing settlement agreements as contracts, *see, e.g., Schurr v. Austin Galleries of Illinois, Inc.,* 719 F.2d 571, 574 (2d Cir.1983) (holding that "[f]or purposes of enforcement, a consent judgment should be construed and interpreted as a contract," and reviewing the contract under New York contract law), *Torres,* 356 F.3d at 245 (holding that a stipulation of dismissal memorializing a private settlement agreement was subject to the rule that "[s]ettlement agreements are contracts" and interpreting the language of the stipulation under New York contract law), the circuit court has not specifically addressed the question of whether it is appropriate, as a matter of public policy, to apply local contract law to settlement agreements reached in the context of litigation over a federal question. *See Ciaramella v. Reader's Digest Ass'n,* 131 F.3d 320, 322 (2d Cir.1997) (declining to decide the question whether New York or federal common law determines whether the parties reached a settlement of claims brought under the ADA, ERISA, and state law because there is no material difference between the applicable state law or federal common law standard); *Landau v. American Int'l Group, Inc.,* No. 97-9365, 1998 WL 712430 (2d Cir.1998) ("We need not address the question of whether federal common law or New York law governs the interpretation of the Agreement with respect to its validity as a release of rights under a federal statute, because the content of federal common law in this context would in any event be supplied by New York law."). Since the circuit has repeatedly applied New York contract law in reviewing settlement agreements, and because New York law is the

applicable law under the choice of law clause in the April settlement agreement, the agreement has been reviewed under New York contract law.

Although defendants do not explicitly invoke Rule 60(b) of the Federal Rules of Civil Procedure in their initial brief, Plaintiffs' Memorandum of Law responds to defendants by arguing that defendants fail to meet the requirements of Rule 60(b). Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Set Aside the Settlement Agreement ("Pl. Mem. of Law") at 1, 2, 4, 7, 16. In their Reply, defendants argue that they are "moving in the first instance to set aside the settlement agreement under contract law, due to specific allegations of misconduct by Playboy and other circumstances," and that after the settlement is vacated, Rule 60(b) permits vacation of the consent judgment. Defendants' Reply Memorandum of Law 3. Both the contract law arguments and the Rule 60(b) arguments are analyzed below.

*3 As noted, although defendants' memorandum of law is not presented as a series of discrete arguments, the arguments in the memorandum break down into two. First, defendants argue that the settlement agreement should be set aside based on fraud, misrepresentation, duress, or mistake since plaintiffs "intentionally and impermissibly" made reference during cross examination of Mr. Cavalluzzo to the March 2003 permanent injunction by stipulation, in breach of the March 2003 settlement agreement ("March settlement agreement"), so as "to poison [the jury's] opinion of Mr. Cavalluzzo."Def. Mem. of Law 2. Alternatively, also based on this alleged breach of the March settlement agreement, defendants argue that the April 9 settlement should be set aside because had the court had access to a copy of the March settlement agreement on April 9, when the cross examination of Mr. Cavalluzzo took place, "the Court seeing that Playboy had impermissibly poisoned the jury, would no doubt have granted a mistrial and likely would have awarded costs to Mr. Cavalluzzo."Def. Mem. of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 4
Not Reported in F.Supp.2d, 2004 WL 626807 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 626807)

Law 3.

Second, defendants argue that the settlement should be set aside because they entered into the settlement agreement under duress and that following the Court's admonition of defense counsel, "Playboy acted swiftly to coerce Cavalluzzo into settlement, utilizing his weakened position to induce a settlement with him that would not otherwise have been reached."Def. Mem. of Law 4. Defendants state several additional grounds for setting aside the settlement based on the above facts, namely collusion, accident, intimidation, and coercion. Def. Mem. of Law 1, 4. Only plaintiffs' second argument based on the court's admonition of defense counsel may fairly be characterized as coercion, though for these purposes the analysis for coercion and duress are the same and both are dealt with in section (1)(b) below. With regard to the remaining claims, defendants have failed to make even a *prima facie* showing in support of their conclusory allegations of collusion, accident, or intimidation.

(a) Alleged Breach of March Settlement Agreement

Defendants contend that during the cross examination of Mr. Cavalluzzo on April 9, plaintiffs breached the March settlement agreement by "intentionally and impermissibly" making reference in front of the jury to the permanent injunction by stipulation agreed to by the parties as part of the March settlement. Def. Mem. of Law 2. Defendants argue that this constituted a breach of the provision of the March settlement agreement by which the parties agreed that the settlement and injunction "shall not be used as evidence at trial."Gioconda Decl. Ex. C. Defendants further contend that plaintiffs "used this illegally obtained upper hand as a sword to persuade Mr. Cavalluzzo to dramatically change his settlement position."Def. Mem. of Law 2. Defendants conclude that "[i]t would be inequitable to allow Playboy to benefit by its breach of the March agreement, and there being no delay in this application [it would be] just to place the parties into the same position they were [sic] before

the April 9th agreement."Def. Mem. of Law 3.

*4 Although defendants contend that the parties should be restored to their pre-settlement positions because plaintiffs breached the March settlement agreement, it would be inappropriate to set aside the April settlement agreement in this instance because the March settlement agreement was not actually breached. The parties agreed that the settlement and the permanent injunction would "not be used as evidence at trial."Gioconda Decl. Ex. C. But in this instance, the reference to the permanent injunction was not actually introduced as substantive evidence; it was merely used to impeach testimony given by Mr. Cavalluzzo at trial.

Plaintiffs allege that at trial Cavalluzzo began to perjure himself on the witness stand when he refused to acknowledge that <www.sexyworkers.com> was his website, and when he denied that he ever used the Playboy trademark as a metatag in the keywords of that website. Pl. Mem. of Law 12; Gioconda Decl. Ex. G (containing April 7, 2003 Tr. 504:4-10, 507:3-14). Plaintiffs have alleged that defendants own the website <www.sexyworkers.com> and, in their Amended Complaint, charged defendants with infringing and diluting Playboy's rights in relation to that site by using the Playboy trademark in the metatags of that website. On March 10, 2003, defendants consented to be permanently enjoined from this conduct and the charges relating to <www.sexyworkers.com> were voluntarily dismissed from the complaint. In order to impeach Cavalluzzo on the issue of his previously-admitted ownership of the <sexyworkers.com> website, as well as his use of Playboy as a metatag on the site, plaintiffs' attorney asked: "Sir, were you charged in this case with a separate charge of having Playboy listed in your metatag keyword for Sexy Workers.Com and you agreed to a permanent injunction, you agreed to take it out...." Defendants objected and were overruled. In reviewing the transcript of the cross examination of Mr. Cavalluzzo, it is clear that plaintiffs' reference to the March permanent in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 626807 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 626807)

Page 5

junction by consent was used properly to impeach Mr. Cavalluzzo and was not introduced as evid- ence.

It is well-established in this circuit that impeachment by counsel of inconsistent or perjured testimony does not constitute "evidence," for questioning by counsel never constitutes evidence. *Washington v. Schriver,* 225 F.3d 45, 61 (2d Cir.2001); *Tolbert v. Queens College,* 242 F.3d 58, 75 (2d Cir.2001). Thus, the provision of the settlement agreement providing that settlement and the permanent injunction would "not be used as evidence at trial" was not breached.

Defendants argue that "[i]f a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party, upon which the recipient is justified in relying, the contract is voidable by the recipient," Def. Reply Mem. of Law 6 (quoting *Restatement (Second) of Contracts* § 164 (1981)), and that "Playboy's misrepresentation was both fraudulent and material and therefore satisfies both of the requirements for the voiding of the contract, either one of which was sufficient to cause rescission ."*Id.* This is indeed the law in New York. *See, e.g., Seneca Wire & Mfg. Co. v. A.B. Leach & Co.,* 247 N.Y. 1, 7-8, 159 N.E. 700, 702 (1928) ("a contract may be rescinded for fraud or misrepresentation"); *see also Horn Waterproofing Corp. v. Bushwick Iron & Steel Co.,* 66 N.Y.2d 321, 325, 488 N.E.2d 56, 58, 497 N.Y.S.2d 310, 312 (1985) ("[W]here there is a real and genuine contest between the parties and a settlement is had without fraud or misrepresentation ... such settlement should be upheld."). In this instance, since the agreement was not breached and since plaintiffs did not misrepresent the contents of the March settlement agreement to the court, there was no fraud or misrepresentation. Thus, the allegations of misrepresentation and fraud with respect to this claim must fail. Likewise, any claim of mistake, misconduct, or duress based on the alleged breach of the settlement agreement must also fail.

*5 Defendants also argue that had the court had ac-

cess to a copy of the March settlement agreement on April 9, when the cross examination of Mr. Cavalluzzo took place, "the Court seeing that Playboy had impermissibly poisoned the jury, would no doubt have granted a mistrial and likely would have awarded costs to Mr. Cavalluzzo."Def. Mem. of Law 3. There is no ground for a mistrial in this case. Defendants had the opportunity to move for a mistrial during the trial and chose not to do so. In fact, at trial the court gave defendants the option of moving for a mistrial if they felt it was warranted. Gioconda Decl. Ex. G (containing April 7, 2003 Tr. at 505:8-506:11) ("Mr. BOSTANY: I don't have a copy of the settlement agreement with me, Judge, but I can bet you that what [plaintiffs' counsel] is doing is laying grounds for a mistrial because there is an agreement we have entered into and [plaintiffs' counsel] refuses to produce his copy, I don't have my copy with me.... THE COURT: I will let it in. We will look at the agreement tomorrow. If you're right, you can renew your application ."). Defendants chose not to move for a mistrial; instead, they entered into the April settlement agreement and consented to a permanent injunction in open court. Gioconda Decl. Ex. H (containing April 10, 2003 Tr. at 2:19-20).

Furthermore, as previously pointed out, Playboy properly impeached defendant Cavalluzzo's testimony upon cross examination. Thus, the reference to the March settlement agreement for this purpose does not provide a sufficient reason to set aside the April 9 settlement agreement. The Federal Rules of Evidence clearly state that although evidence of a settlement "is not admissible to prove liability for [a] claim," the evidence need not be excluded "when the evidence is offered for another purpose."Fed.R.Evid. 408. Courts have held that evidence otherwise excludable pursuant to Rule 408 is admissible for the purposes of impeachment. *See, e.g., Cochenour v. Cameron Savings and Loan,* 160 F.3d 1187, 1190 (8th Cir.1998) ( an offer to compromise may be used to rebut a party's prior testimony); *Reichenbach v. Smith,* 528 F.2d 1072, 1075 (5th Cir.1976) ("Rule 408 codifies a trend in case

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 626807 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 626807)

law that permits cross-examination concerning a settlement for the purpose of impeachment."); *Tribune Co. v. Purcigliotti,* No. 93-7222, 1996 WL 337277 (S.D.N.Y. June 19, 1996) (settlement discussions may be used for impeachment). Therefore, evidence of a settlement could properly be used to impeach a witness on cross-examination. Had defendants wanted to exclude the use of the settlement for impeachment purposes, at a minimum an explicit provision was required assuming the parties could agree to distort the truth-finding function in this way. Furthermore, as discussed above, questioning by an attorney does not constitute evidence. The court, in its preliminary instructions to the jury, explained as much when it stated that upon cross-examination of a witness "what is evidence in the case are the responses to the questions not the questions themselves."Pl. Mem. of Law 13 (citing Tr. at 17:6-9). Defendants' assertion that plaintiffs "impermissibly poisoned the jury" is simply untrue. It is clear that the reference during cross examination to the permanent injunction by stipulation that accompanied the March settlement agreement was appropriate and does not constitute a grounds for mistrial.

*6 Consequently, defendants' contention that the court "would no doubt have granted a mistrial" if it had been aware of the terms of the settlement agreement is not at all a foregone conclusion. In fact, it is highly unlikely that plaintiffs' line of questioning would have resulted in a mistrial. For these reasons, defendants' argument that the April settlement agreement should be set aside because the court would have granted a mistrial must also fail.

And even if these facts provided sufficient grounds for a mistrial, it is clear that defendants were given the option of moving for a mistrial but opted to settle the claim instead. Defendants' request that the settlement be set aside is an inappropriate attempt to relitigate a case that already went to trial and was deliberately settled by both parties prior to the trial's conclusion. If defendants felt that plaintiffs'

conduct amounted to misconduct justifying a mistrial, defendants should not have agreed to settle. Rather, defendants should have created a clear record in the course of trial and either moved for a mistrial or raised the issue of plaintiffs' misconduct on appeal if the jury had rendered an unfavorable verdict.

**(b) Court's Admonition of Defense Counsel**

Defendants also allege that Mr. Cavalluzzo entered into the settlement agreement under duress and that "[f]ollowing the Court's threat to disbar his attorney, Playboy acted swiftly to coerce Cavalluzzo into settlement, utilizing his weakened position to induce a settlement with him that would not otherwise have been reached."Def. Mem. of Law at 4. The relevant portion of the transcript is as follows:

Q. Let's talk for a moment about these invoices. Now, these invoices that you have that say On Line on them and Bigcoin on them from January of 1998, I asked you at your deposition-well, it wasn't me, actually, another lawyer asked you at your deposition when Bigcoin was formed and when On Line was formed. Do you recall that testimony?

A. Right.

Q. I read some of it earlier today. You testified at your deposition last summer that Bigcoin wasn't even formed until late '98 and On Line wasn't even formed until late '98?

A. I don't think I testified to On Line. I probably said I don't know. How would I testify to something I don't know?

Q. Were you asked this question and did you give this answer under oath just last summer-

MR. BOSTANY: This was read already and already reviewed on direct and voir dire.

THE COURT: Overruled. Go ahead.

Q. "Question: You're saying we provided a service

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 626807 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 626807)

Page 7

that On Line paid for. Who is we?

"Answer:" This is you talking under oath. "Bigcoin. That was not until late ' 98 though and On Line Entertainment wasn't formed until late '98."That was your testimony?

MR. BOSTANY: Objection. Did you read the entire thing? I think he said I guess and maybe-

THE COURT: Folks, please step inside. Do not discuss the case.

(The jury exits the court room.)

*7 THE WITNESS: Outside?

THE COURT: You can stay right there.

What do you think, this is a stage? Do you think this is a stage? Do you think I give you admonitions repeatedly, repeatedly, repeatedly because I don't mean them, because I am trying to make life difficult for you? Do you realize you have some responsibilities here? This is not Vaudeville, this is not stich, this is a court of law. If this happens again you will not be a member of this court of law. I am serious, this is not a game. You don't invent evidence with your commentary.

MR. BOSTANY: Judge, if we read back the exact language-

THE COURT: You just keep your mouth shut. You have a responsibility to abide by my rulings and I've done my best to show my patience to you in this case. You don't create evidence by innuendo and snide comments. You don't litigate in this courtroom by that kind of behavior. I will not have it again. I am warning you for the last time.

(Recess taken.)

THE COURT: Bring them in.

MR. BOSTANY: Judge, I wanted to read from the transcript, if that's possible, before the jury came in.

THE COURT: Read what transcript?

MR. BOSTANY: If I can read either now or after the jury comes in. I don't want to do the wrong thing.

THE COURT: What do you want to do?

MR. BOSTANY: I just want to read the portion of the testimony from the transcript.

MR. DESMARAIS: Your Honor, he can do it on redirect.

THE COURT: The question is have you read from it and did you read it incompletely? If you have, make it complete.

MR. BOSTANY: Thank you, Judge.

(The jury enters the courtroom.)

THE COURT: Thank you. Please be seated, folks.

I'm sorry for the interruption. I'm sure you can appreciate the stresses confronting all counsel in a case of this sort. They have significant responsibilities to their respective clients, as well as the Court. Occasionally it requires the Court to intervene. If it does, it has nothing to do with the merits of the issues that will be decided and I want you to keep that firmly in mind.

All right sir, please continue.

Gioconda Decl. Ex. G (containing Tr. 456:17-459:13).

This dialogue makes clear that defendants did not enter into the April 9 settlement agreement under duress. "Under New York law, which governs, '[a] contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will.'[A]nd duress may take the form of unlawful restraint of property or use of wrongful economic compulsion to force a party to yield to demands that would oth-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 626807 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 626807)

erwise be rejected."*First National Bank v. Pepper,* 454 F.2d 626, 632 (2d Cir.1972) (quoting *Austin Instrument, Inc. v. Loral Corp.,* 29 N.Y.2d 124, 130, 324 N.Y.S.2d 22, 25, 272 N.E.2d 533, 535 (1971)); *see also McIntosh v. Consolidated Edison Co.,* No. 96-3624, 1999 WL 151102, at *2 (S.D.N.Y. Mar.19, 1999) (holding that "[t]o void a contract based on duress, one of three circumstances must be present: duress by physical compulsion, duress by threat, or duress by undue influence. Duress may not be found merely from the existence of a difficult bargaining position or the pressure of financial circumstances. To succeed on a theory that an agreement was procured by duress, a plaintiff must show that he was compelled to agree to its terms by way of wrongful and oppressive conduct that precluded the plaintiff from the exercise of his own free will.") (citations omitted), *aff'd* 2001 WL 1669111 (2d Cir. June 8, 2000). Defendants have failed to meet the burden of proving duress by physical compulsion, duress by threat, or duress by undue influence.

*8 Likewise, defendants have failed to prove coercion, for in this context coercion is merely a form of duress. *See Citibank, N.A. v. Real Coffee Trading Co., N.V.,* 566 F.Supp. 1158, 1162 (S.D.N.Y.1983) ("To set aside an agreement on the ground that it was the product of economic duress, the party making the claim must make a convincing showing that the agreement was coerced by means of a wrongful threat such that the exercise of free will was precluded."); *Record Club of America, Inc. v. United Artists Records, Inc.,* 611 F.Supp. 211, 216 (S.D.N.Y.1985) (equating coercion with economic duress and holding that "there was no coercion because plaintiff's clear alternative to entering into the side agreements was to proceed to trial"), *vacated and remanded on other grounds,* 890 F.2d 1264 (2d Cir.1989).

There is no merit to defendants' argument that the court's reprimand of defense counsel, outside the presence of the jury, constituted duress or was in any way improper. In fact, even after reprimanding defense counsel for his conduct, the judge favorably responded to defense counsel's objection by instructing plaintiffs' counsel to read the complete transcript of the relevant portion of the deposition that was the subject of cross examination. Moreover, though the jury was not present during the admonition of defense counsel, the judge immediately issued an instruction to the jury, upon its return, to the effect that they should not allow the conduct of counsel to affect their determination of the merits of the case. The conduct of the court in no way requires the setting aside of the settlement agreement. Even if the court's conduct amounted to coercion, intimidation, or duress-and it does not-the proper remedy would be for the lawyer to create a record and take an appeal from an unfavorable verdict. It certainly does not serve the interests of justice to allow a party who fears an unfavorable trial outcome because of a judge's presumed hostility to settle the claim prior to its conclusion, and to then move to set aside the settlement and have the case retried. Since the settlement agreement was not procured by duress or coercion, it cannot be voided or set aside on this basis.

(c) Fed. Rule Civ. P. 60(b)

In order to give defendants the benefit of the doubt, and since plaintiffs treat defendants' motion as a Rule 60(b) motion, the motion will be analyzed as Rule 60(b) motion as well. Under Rule 60(b), the Federal Rules of Civil Procedure provide that

[T]he court may relieve a party ... from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence ...; (3) fraud ..., misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 626807 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 626807)

Page 9

*9 Fed.R.Civ.P. 60(b). Here, defendants do not specify which of the six bases for relief under Rule 60(b) they seek to invoke. However, a review of defendants' submissions reveals that only clauses (1), (3) and (6) are potentially applicable as there is no claim of newly discovered evidence and the judgment plaintiffs seek to vacate is not void nor has it been satisfied.

As a general matter, there is a strong interest in the finality of judgments, especially when the parties have entered into a settlement agreement. *See Nemaizer v. Baker,* 793 F.2d 58, 61 (2d Cir.1986) ("Properly applied Rule 60(b) strikes a balance between serving the ends of justice and preserving the finality of judgments."). Because Rule 60(b)"allows extraordinary judicial relief, it is invoked only upon a showing of exceptional circumstances."*Nemaizer,* 793 F.2d at 61;*see also Mendell In Behalf of Viacom, Inc. v. Gollust,* 909 F.2d 724, 731 (2d Cir.1990) ("Motions under Rule 60(b) are addressed to the sound discretion of the district court and are generally granted only upon a showing of exceptional circumstances.")."Courts typically require that the evidence in support of the motion for relief [under Rule 60(b) ] be 'highly convincing,' that a party show good cause for the failure to act sooner, and that no undue hardship be imposed on other parties."*Jedrejcic v. Croatian Olympic Committee,* 190 F.R.D. 60, 77 (E.D.N.Y.1999) (quoting *Gonzalez v. Gannett Satellite Info. Network, Inc.,* 903 F.Supp. 329, 331 (N.D.N.Y.1995), *aff'd,*101 F.3d 109 (2d Cir.1996)).

To grant relief under Rule 60(b)"a court must find that (1) the circumstances of the case present grounds justifying relief and (2) the movant possesses a meritorious claim in the first instance."*Jedrejcic,* 190 F.R.D. at 77 (quoting *Cobos v. Adelphi Univ.,* 179 F.R.D. 381, 385 (E.D.N.Y.1998)). Moreover, in a Rule 60(b) motion, "[a] movant's burden is even more formidable where the movant has made a deliberate choice to enter into a settlement agreement as opposed to having litigated the case on the merits and

*Rand Int'l Leisure Prods., Ltd. v. TekSource, L.C.,* No. 97-319, 1998 WL 372356 at *1 (E.D.N.Y. July 2, 1998) (citing *Nemaizer,* 793 F.2d at 63);*see also Ackermann v. United States,* 340 U.S. 193, 198, 71 S.Ct. 209, 95 L.Ed. 207 (1950) ("There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from.").

Defendants' claims that the court would have granted a mistrial if it had access to the March settlement agreement could be interpreted as a motion to set aside the April 9 settlement based on "mistake." Fed.R.Civ.P. 60(b)(1).*See Tarkington v. United States Lines Co.,* 222 F.2d 358, 360 (2d Cir.1955) (holding that "mistake" under Rule 60(b) has been held to include mistakes of law by the district court); *Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.),* 346 F.3d 31, 35 (2d Cir.2003) (holding that Rule 60(b)(1) is available for a district court to correct mistakes of law, as well as mistakes of fact). As discussed earlier in section (1)(a) of this Memorandum and Order, there were no mistakes of law or fact in the trial leading up to the April 9 settlement. Thus, defendants have failed to make the showing of mistake required under Rule 60(b)(1).

*10 Defendants' contention that the settlement agreement should be set aside because it was breached and because plaintiffs "intentionally and impermissibly" made reference in front of the jury to the settlement agreement and permanent injunction in order "to poison [the jury's] opinion of Mr. Cavalluzzo," could be interpreted as a motion to set aside the April 9 settlement based on "fraud ... misrepresentation, or other misconduct of an adverse party."Fed.R.Civ.P. 60(b)(3).*See also Walther v. Maricopa Intern. Inv. Corp.,* No. 97-4816, 2002 WL 31521078, at *3 (S.D.N.Y. Nov.12, 2002) (citing *Stewart v. O'Neill*, No. 00-8560, 2002 WL 1917888, at *1 (S.D.N.Y. Aug.20, 2002) (quoting *Fleming v. N.Y.U.,* 865 F.2d 478, 484 (2d Cir.1989))) ("With respect to a Rule 60(b)(3) motion specifically, the moving party must demonstrate, by clear and convincing evidence, that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 626807 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 626807)

Page 10

'material misrepresentations' were made and cannot use the motion simply 'as an attempt to relitigate the merits' of the case."); *Walther*, 2002 WL 31521078, at *3 (citing *Chnapkova v. Koh*, No. 88-6144, 1992 WL 203906, at *2 (S.D.N.Y.Aug.7, 1992)) ("In addition to demonstrating fraud or other misconduct by clear and convincing evidence, the movant must also show that 'this conduct prevented [the movant] from fully and fairly presenting his case.' "). Moreover, "Rule 60(b)(3) is typically 'invoked where material information has been withheld or incorrect or perjured evidence has been intentionally supplied.' " *Walther*, 2002 WL 31521078, at *3 (citing *Matter of Emerg. Beacon Corp. v. Barr*, 666 F.2d 754, 759 (2d Cir.1981)). As explained in section (1)(a) of this Memorandum and Order, defendants have failed to make a showing of fraud, misrepresentation, or misconduct. Thus, defendants fail to make the showing required under Rule 60(b)(3).

Defendants' claim of duress could also be construed as a Rule 60(b)(6) motion, which provides that Rule 60(b) may be invoked for "any other reason justifying relief from the operation of the judgment" that is not listed in clauses (1) through (5) of the rule. *See McIntosh v. Consolidated Edison Co.*, No. 96-3624, 1999 WL 151102, at *2 (S.D.N.Y. Mar.19, 1999) (denying a motion to set aside a settlement agreement under Rule 60(b)(6) and holding that "[t]o void a contract based on duress, one of three circumstances must be present: duress by physical compulsion, duress by threat, or duress by undue influence. Duress may not be found merely from the existence of a difficult bargaining position or the pressure of financial circumstances. To succeed on a theory that an agreement was procured by duress, a plaintiff must show that he was compelled to agree to its terms by way of wrongful and oppressive conduct that precluded the plaintiff from the exercise of his own free will.") (citations omitted), *aff'd*2001 WL 1669111 (2d Cir. June 8, 2000). As explained in section (1)(b) of this Memorandum and Order, defendants have failed to meet the burden of proving duress by physical compulsion,

duress by threat, or duress by undue influence. Therefore, defendants have failed to make a showing of duress that could amount to a "reason justifying relief from the operation of the judgment" under Rule 60(b)(6).

*11 None of the other claims raised by defendants could fall under Rule 60(b)(6) because clause (6) is inapplicable when plaintiffs' asserted grounds for relief are recognized in clauses (1) and (3) of the rule. *See Nemaizer v. Baker*, 793 F.2d 58, 63 (2d Cir.1986) (relief under Rule 60(b)(6) is only appropriate when "the asserted grounds for relief are not recognized in clauses (1)-(5) of the rule ."); *Cobos v. Adelphi Univ.*, 179 F.R.D. 381, 386 n. 5 (E.D.N.Y.1998) ("Clauses (1) and (6) are mutually exclusive."); *Interactive Edge, Inc. v. Martise*, No. 97-3354, 1998 WL 35131 at *4 (S.D.N.Y. Jan.30, 1998) (noting the sixth subsection "is properly invoked only ... when the asserted grounds for relief are not recognized in clauses (1)-(5)") (quoting *Nemaizer*, 793 F.2d at 63).

Thus, defendants' motion also fails when treated as a Rule 60(b) motion.

### (2)

### Cross-Motions

Plaintiffs have filed two cross-motions in this case. The first cross-motion is a request that the docket entries be sealed since the very existence of the Settlement Agreement, as well as its contents, are intended to be confidential by the written, express agreement of the parties. April 21, 2003 Letter from Joseph C. Gioconda. Since the April 9 Settlement Agreement resulted in the dismissal of a trial that is on the public record, the existence of the settlement agreement cannot be deemed to be confidential and thus there is no reason to file under seal documents that simply make reference to the settlement agreement. Thus, the motion is granted in part and denied in part. As per the terms of the April 9 Settlement Agreement, any copies of the April 9 Set-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 626807 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 626807)**

Page 11

tlement Agreement itself, including those contained as attachments to papers filed in this motion, shall be filed under seal. All other papers, including those making reference to the April 9 Settlement Agreement, do not have to be filed under seal.

The second cross-motion is for an order to show cause requesting that the court enforce the Permanent Injunction and Settlement Agreement by: (1) ordering Mr. Cavalluzzo to immediately deliver all rights, passwords and title to the <www.sexcourt.com> and <www. pamelaanderson-lee.net> domain names to Playboy; and (2) to pay Playboy's costs and attorneys' fees associated with the preparation of the papers related to the cross motion. At a conference held in open court on April 30, 2003, the defendants agreed that the domain names listed in the order to show cause were in their possession and that this was a moot issue. April 30, 2003 Tr. 17:21-18:4, 19:10. Therefore, the motion for an order to show cause is denied as moot.

### Conclusion

*12 Accordingly, defendants' motion to set aside the April 9 settlement, to vacate the April 10 permanent injunction and judgment, and to set a date for a new trial is denied.

Plaintiffs' cross-motion requesting that the docket entries be sealed is granted in part and denied in part, to the extent that any copies of the April 9 Settlement Agreement itself, including those contained as attachments to papers filed in this motion, shall be filed under Seal, while all other papers, including those making reference to the April 9 Settlement Agreement, do not have to be filed under seal.

Plaintiffs' cross-motion for an order to show cause is denied as moot.

The Clerk of the Court is directed to close the case.
Dated: Brooklyn, New York

SO ORDERED.

E.D.N.Y.,2004.
Playboy Enterprises Intern., Inc. v. On Line Entertainment, Inc.
Not Reported in F.Supp.2d, 2004 WL 626807 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.