UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                           :

GMA ACCESSORIES, INC.,

                                           :

                          Plaintiff,             07 Civ. 3219 (LTS)(DF)

                                           :

           -against-                   **REPORT AND**

                                         :     **RECOMMENDATION**

EMINENT, INC., et al.,                 :

                        Defendants.     :
------------------------------------------------------------------------X

**TO THE HONORABLE LAURA TAYLOR SWAIN, U.S.D.J.:**

      Before the Court is a motion (Dkt. 159) by plaintiff GMA Accessories, Inc. ("GMA") to

hold defendant BOP LLC ("BOP") and non-party Sanei Charlotte Ronson ("Sanei") in civil

contempt of a consent injunction entered by the Court as an Order and Judgment. GMA is the

holder of the trademark "CHARLOTTE," and the injunction at issue permanently enjoins BOP,

an online retailer, from "using the mark CHARLOTTE or any marks similar to or substantially

indistinguishable therefrom, including the mark CHARLOTTE SOLNICKI, in connection with

the sale, purchase, offering for sale, display, transfer, marketing, advertising or distribution of

unauthorized clothing or related merchandise."[1] According to GMA, BOP has violated this

injunction by selling clothing or related merchandise marked with the name "CHARLOTTE

RONSON," and Sanei, BOP's supplier of the "CHARLOTTE RONSON" merchandise, has

acted in concert with BOP to violate the injunction.

      For the reasons set forth herein, I recommend that GMA's contempt motion against BOP

be granted and contempt sanctions imposed, but that GMA's motion against Sanei be denied.

---

[1] Order and Judgment as to BOP, LLC, dated Oct. 18, 2007 (the "Judgment") (Dkt. 79).

## BACKGROUND

The injunction at issue was initially proposed to GMA by BOP as part of an offer of judgment under Fed. R. Civ. P. 68. (*See* Affidavit of Jeffrey Wang, sworn to Oct. 19, 2007 ("Wang Aff.") (Dkt. 82), at ¶ 6, Ex. H (Offer of Judgment Pursuant to Federal Rule of Civil Procedure 68, dated Sept. 7, 2007 ("BOP's Offer of Judgment").) According to BOP, it decided that it was willing to settle the case by refraining from selling, or offering for sale, any clothing or related merchandise marked with the "CHARLOTTE" name, standing alone, as well as any clothing or related merchandise marked with the name "CHARLOTTE SOLNICKI," and this was the impetus for its settlement offer. (*See id.*, at ¶ 6; Letter to the Court from Jeffrey Wang, Esq., dated Sept. 19, 2007 (Dkt. 68 (Mem. Endors.).) GMA accepted the consent injunction as proposed (*see* Amended Notice of Acceptance with Offer of Judgment, dated Sept. 18, 2007 (Dkt. 67), thereby resolving its claims against BOP in this case, and the Court (Swain, J.) entered the Judgment on October 18, 2007, incorporating the injunction.

Shortly after the parties reached their agreement, however, they began to dispute whether the agreed injunction would extend to cover clothing sold by BOP that was marked with the name "CHARLOTTE RONSON." (*See* Wang Aff., at ¶ 13-14.) Arguing that this was never its intent, BOP moved under Fed. R. Civ. P. 60 to withdraw, vacate or modify its offer of judgment and the Court's Judgment against it. (*See* Memorandum of Law in Support of Defendant BOP, LLC's Motion to Withdraw, Vacate or Modify BOP's Offer of Judgment and the Resulting Judgment, dated Oct. 19, 2007 ("BOP's Rule 60 Mem.") (Dkt. 81).) BOP argued, in its motion, that its proposed injunction was only supposed to cover the specific marks "CHARLOTTE" and "CHARLOTTE SOLNICKI," and that, absent a modification of the injunction to make this

plain, it should be relieved from both its offer and the Judgment.  (*See id.*, at 14-17.)

Judge Swain denied BOP's motion, finding that the language of BOP's Rule 68 offer was

broader than what was then being posited by BOP; that BOP had not demonstrated any

justification under Rule 60(b)(1) for failing to avoid its mistake (assuming it had made a mistake

in offering an injunction that was broader than intended); and that there was no ambiguity in the

language of the offer that justified setting aside the judgment under the "catch-all" provision of

Rule 60(b)(6).  (*See* Memorandum Order (Swain, J.), dated Dec. 20, 2007 ("12/20/07 Order")

(Dkt. 129), at 5-8.)  The Court further noted that, even if some ambiguity existed as to the

meaning of the injunction, any such ambiguity should be resolved against BOP, as the drafter of

its own Rule 68 offer.  (*See id.*, at 6-7.)

On March 26, 2008, upon learning that BOP was continuing to advertise "CHARLOTTE

RONSON" clothing for sale on its website, GMA moved *ex parte* for an Order directing BOP

and Sanei to show cause why they should not be held in contempt of the injunction.  (*See* Order

To Show Cause, dated March 26, 2008 ("Order To Show Cause") (Dkt. 159); Declaration of

Crystal S. A. Scott, sworn to March 26, 2008 ("Scott Decl.") (Dkt. 160), at ¶ 4-6.)  The Court

issued the proposed Order To Show Cause, and both BOP and Sanei responded to that Order by

filing written submissions.[2]  On May 2, 2008, after two telephone conferences with counsel, this Court heard oral argument from GMA and BOP on the contempt motion.[3]

On May 9, 2008, the Court issued an Order directing the parties to make further submissions, so as to place before the Court exemplars of the marks at issue, as used on both BOP's website and the merchandise in question.  (*See* Memorandum and Order (Freeman, J.), dated May 9, 2008 ("5/9/08 Order") (Dkt. 218).)  GMA, BOP, and Sanei then each made an additional submission pursuant to the Court's Order.  (*See* GMA's Response to Court Order for Exemplars, dated May 14, 2008 ("GMA's Exemplars"); BOP's Response to Court Order for Exemplars, dated May 14, 2008 ("BOP's Exemplars"); Sanei's Response to Court Order for Exemplars, dated May 14, 2008 ("Sanei's Exemplars").

---

[2] *See* Memorandum of Law of BOP, LLC in Opposition to GMA Accessories, Inc.'s Contempt Motion, dated Apr. 11, 2008 ("BOP's Opp. Mem.") (Dkt. 177); Declaration of Jeffrey R. Wang, dated Apr. 11, 2008 ("Wang Decl.") (Dkt. 178); Memorandum of Law of Sanei Charlotte Ronson LLC in Opposition to Plaintiff's Motion for Contempt, dated Apr. 11, 2008 ("Sanei Opp. Mem.") (Dkt. 176); Memorandum of Law of Sanei Charlotte Ronson LLC in Support of Motion to Sever and Stay Plaintiff's Motion for Contempt, dated Apr. 11, 2008 ("Sanei Mem. to Sever") (Dkt. 172); Declaration of Mary L. Grieco in Support of Sanei Charlotte Ronson, LLC's Motion to Sever and Stay Plaintiff's Motion for Contempt and in Support of Sanei Charlotte Ronson, LLC's Opposition to GMA Accessories, Inc.'s Motion for Contempt, dated Apr. 11, 2008 ("Grieco Decl.") (Dkt. 170, 174); Declaration of Charlotte Ronson in Support of Sanei Charlotte Ronson, LLC's Motion to Sever and Stay Plaintiff's Motion for Contempt and in Support of Sanei Charlotte Ronson, LLC's Opposition to GMA Accessories, Inc.'s Motion for Contempt, dated Apr. 10, 2008 ("Ronson Decl.") (Dkt. 171, 173).

[3] The Court did not hear oral argument from Sanei, which informed the Court, at the time, that it had reached an agreement in principle to resolve all disputes between it and GMA.  (*See* Transcript of Oral Argument, conducted May 2, 2008 ("Tr."), at 5, ll. 13-22.)  Since then, the Court has been informed that GMA and Sanei were not, in fact, able to resolve their differences, and thus the Court must act on GMA's contempt motion against Sanei.  (*See* Letters to the Court from Ira S. Sacks, Esq., dated May 7, 2008; Letter to the Court from John P. Bostany, Esq., dated May 7, 2008.)  The Court does not believe, however, that any further argument from Sanei is required for a just resolution of the motion, given the length and detail of Sanei's written submissions.

## DISCUSSION

I.    **THE CONTEMPT MOTION AGAINST BOP**

A.    **Applicable Legal Standards**

A defendant may be held in civil contempt for failing to comply with an order of the

Court, including an order entered on consent, where the plaintiff establishes (1) that the order

was "clear and unambiguous," and (2) "the proof of non-compliance is clear and convincing."

*Chao v. Gotham Registry, Inc.,* 514 F.3d 280, 291 (2d Cir. 2008) (citation omitted).  Further,

"[a]lthough the defendant's conduct need not be willful, a plaintiff must also prove that (3) the

defendant has not been reasonably diligent and energetic in attempting to comply."  *Id.*

(citations omitted).

B.    **The Injunction in This Case Was Clear and Unambiguous.**

BOP argues that the injunction at issue here was ambiguous as to whether BOP was

prohibited from offering "CHARLOTTE RONSON" goods for sale on its website.  (*See* BOP

Opp. Mem., at 7-11.)  In particular, BOP asserts that it is not clear from the face of the injunction

whether "CHARLOTTE RONSON" should be considered "similar to" GMA's "CHARLOTTE"

trademark, thus bringing "CHARLOTTE RONSON" within the scope of the injunction.[4]  (*See*

*id.*, at 5, 7-11.)

---

[4] The Court notes that, although the Judgment prohibits BOP from selling goods under any mark that is either "similar to" or "substantially indistinguishable" from GMA's "CHARLOTTE" mark, GMA's contempt argument is based only on the first of those phrases – *i.e.,* it contends that the "CHARLOTTE RONSON" mark is "similar to" its "CHARLOTTE" mark  The phrase "substantially indistinguishable" appears within the Lanham Act's definition of a "counterfeit" mark, *see* 15 U.S.C. § 1127 (defining a "counterfeit" mark as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark"), and GMA has not suggested that "CHARLOTTE RONSON" falls within such a category.

5

The Court, however, has already found the language of the very injunction at issue to be *unambiguous*. Specifically, in determining that BOP was not entitled to Rule 60(b) relief from the parties' settlement agreement on the proffered ground that the language of its settlement offer was ambiguous with respect to its potential coverage of marks other than "CHARLOTTE" and "CHARLOTTE SOLNICKI," the Court found "that the language of Bop's offer, although broad, is not ambiguous." (12/20/07 Order, at 6.)

Moreover, the case law makes plain that merely broadening an injunction to prohibit the use of marks "similar to" an infringing mark does not render the injunction ambiguous for purposes of avoiding a contempt sanction. For an injunction to be "clear and unambiguous" in this context, it need only be "specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *New York State Nat'l. Org. for Women v. Terry,* 886 F.2d 1339, 1352 (2d Cir. 1989); *see also King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995) (explaining that the subject of an injunction must be able to ascertain the proscribed conduct "from the four corners of the order"). This does not mean that every conceivable example of the prohibited conduct must be spelled out in the text of the order. "Injunctions necessarily rely on descriptive language," *Bear U.S.A., Inc. v. Kim,* 71 F. Supp. 2d 237, 247 (S.D.N.Y. 1999), and thus, in order to withstand scrutiny on a contempt motion, "[i]t is not necessary [for an injunction] to anticipate and name every variation on a trademark that a creative infringer might use in order to skirt a judgment," *id.* (finding language of an injunction to be unambiguous where it prohibited, *inter alia,* the sale of "any product bearing any . . . confusingly similar imitation [of] the trademarks").

6

Further, in a trademark or copyright case, the language of an injunction may itself incorporate examples of marks or designs that would be covered by its prohibitions, thereby providing guidance as to scope of the order.  In *Benham Jewelry Corp. v. Aron Basha Corp.,* No. 97 Civ. 3841 (RWS), 1997 U.S. Dist. LEXIS 15927 (S.D.N.Y. Oct. 14, 1997), for example, the Court found an injunction barring the counter-claim defendant ("Benham") from marketing jewelry with designs "substantially similar" to those of the counter-claim plaintiff ("Basha") to be clear and unambiguous, *id.* at *5, in part because the injunction itself "afforded Behnam with a clear indication that a [pendant with a certain type of design] would be 'substantially similar' to the design of one of Basha's copyrighted pendants, because one of the . . . pendants enjoined in the [injunction] matched this description," *id.* at *8.  Here, in its prior order, the Court has already recognized that the injunction in this case, as drafted, provided such guidance to BOP:

> Even if the term CHARLOTTE, used alone, might have created ambiguity as to whether marks comprised of the word CHARLOTTE and an additional word or term fell within the scope of the injunction, Defendant cured any such potential ambiguity in the offer itself.  Defendant proffered CHARLOTTE SOLNICKI, a two-word term with CHARLOTTE as the first word in the term, as an example of 'any marks similar to or substantially indistinguishable' from the term CHARLOTTE.

(12/20/07 Order, at 6 (citing BOP's Offer of Judgment).)

Despite the Court's prior determination that the injunction is not "ambiguous" for lack of sufficient specificity as to whether two-word marks could fall within its scope (*see id.*), BOP continues to argue that the order *is* ambiguous with respect to its coverage of the mark "CHARLOTTE RONSON."  In making this argument, BOP suggests that any prior ruling of the Court on the question of ambiguity should not be viewed as decisive, as the question of whether an order is "clear and unambiguous" for purposes of a contempt motion cannot be answered "in

7

a vacuum," but rather must be answered "with reference to the conduct in question." (*See* BOP Opp. Mem., at 9-10 (quoting *Perez v. Danbury Hospital,* 347 F.3d 419, 424 (2d Cir. 2003)).) Thus, BOP suggests that, regardless of whether the "similar to or substantially indistinguishable from" standard of the injunction is "clear" as a general matter, the application of that standard to "CHARLOTTE RONSON," in particular, creates an ambiguity. (*See id.,* at 10.)

Yet *Perez*, the decision on which BOP relies to support this argument, involved a challenge to conduct that did not fall within the four corners of the injunction at issue in that case. *See Perez* at 424 (noting that the consent decree "prohibits only 'limit[ing], preclud[ing] or obstruct[ing] the Plaintiffs . . . from practicing neonatology,' but says nothing of taking steps to prevent other doctors from interfering with CNC physicians' practice or of changing the designation policy"). Indeed, in reversing the contempt holding of the district court, the Second Circuit noted that the court had failed to identify any specific command in the injunction that the defendants had violated. *See id.* It was under those circumstances that the Second Circuit held that the plaintiffs had failed to establish a violation of a "clear and unambiguous" order. *Id.* at 424-25. This case presents a wholly different type of question – whether the words "similar to" create an ambiguity such that Bop is unable to understand what conduct would be proscribed by the injunction. As discussed herein, this Court concludes that the language of the injunction does not create such an ambiguity.

In sum, the injunction at issue unambiguously covers not only the use of the "CHARLOTTE" mark itself, but also marks "similar" to it, which – as shown by the language of the injunction itself – may include two-word terms, where "CHARLOTTE" is used as one of those two terms. While the Court agrees with BOP that the language of the injunction should not

be construed to include, *per se,* any and *all* two-word marks that include the name

"CHARLOTTE," without any individualized consideration of the particular mark in question

(*see* BOP Opp. Mem., at 5), the injunction is sufficiently clear to be enforceable by the Court

when BOP chooses to use a mark that, based on all relevant criteria, is unquestionably "similar

to" GMA's "CHARLOTTE" mark.

### C.    GMA Has Sufficiently Demonstrated BOP's Non-Compliance.

When the Court is called upon to determine whether a trademark has been infringed

under the Lanham Act, 15 U.S.C. § 1051, *et seq.,* the ultimate question before the Court is

whether the alleged infringer's use of the mark is likely to cause confusion.  This question is

answered through an analysis of the so-called "*Polaroid* factors," first set out in *Polaroid*

*Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d. Cir.), *cert. denied,* 368 U.S. 820 (1961).

These factors include the strength of the mark, the degree of similarity between the two marks,

the proximity of the products in their respective markets, the likelihood that the prior owner will

"bridge the gap" between the products, whether consumers have demonstrated actual confusion,

whether the defendant has acted in good faith, the quality of the defendant's product, and the

sophistication of the buyers.  *Id*. at 572.

When, however, the Court is only called upon to determine whether an injunction

prohibiting certain trademark use has been violated, the Court faces a much narrower question.

In that context, the only question for the Court is whether the defendant's use of a mark has

fallen within the coverage of the injunction, as phrased.  *See Wella Corporation v. Wella*

*Graphics, Inc.,* 37 F.3d 46, 48 (2d Cir. 1994).  Thus, in *Wella*, where the injunction at issue

prohibited the defendant from using "Wella or any mark confusing[ly] similar to [Wella

Corporation's] mark Wella," the only question for the Court was whether the mark "Wello," as used by the defendant, was "confusingly similar" to "Wella." *Id*. The Second Circuit held that the district court had erred by considering all of the *Polaroid* factors in making its contempt determination, and remanded for the court to consider the narrower question at issue. *Id.*; *see also Wolfard Glassblowing Co. v. Willy Vanbragt,* 118 F.3d 1320, 1322 (9th Cir. 1997) (on motion to hold defendant in contempt of a consent decree, following *Wella* and holding that the only question for the court was whether, given the language of the agreed injunction, defendant's product was a "colorable imitation" of plaintiff's).

Accordingly, the question for this Court is whether GMA has demonstrated, by clear and convincing evidence, that the mark used by BOP, *i.e.,* "CHARLOTTE RONSON," is "similar to or substantially indistinguishable" from GMA's mark, "CHARLOTTE." On this question, this Court particularly takes note of two prior opinions of the Court, one in this case and one in another case that also involved GMA's "CHARLOTTE" mark, where the issue of that mark's "similarity" to other marks was considered. Although neither of these prior opinions addresses the degree of similarity between "CHARLOTTE" and "CHARLOTTE RONSON," in particular, both opinions present close analogies to the situation presented here and are thus instructive.

First, in this case, in the course of granting a default judgment in GMA's favor against three named defendants who had allegedly used either "CHARLOTTE" or the two-word mark "CHARLOTTE SOLNICKI" on women's clothing, the Court (Swain J.) briefly went through the *Polaroid* factors, and found, with respect to the "similarity" factor, that the marks used by the defendants bore "a significant degree of similarity" to GMA's mark. *GMA Accessories, Inc. v. BOP LLC,* 507 F. Supp. 2d 361, 364 (S.D.N.Y. Aug. 29, 2007), *vacated in part by GMA*

10

*Accessories, Inc. v. BOP LLC,* No. 07 Civ. 3219 (LTS) (DF), 2008 U.S. Dist. LEXIS 26120 (S.D.N.Y. Mar. 20, 2008). Although the Court's analysis was in the context of a default motion, and thus its decision was not based on an evidentiary record or a visual inspection of the marks as displayed on product labels, the Court nonetheless noted that, based on the words that comprised the marks at issue, "[t]he marks are in some instances identical and in all instances share the common, arbitrary term CHARLOTTE, indicating a significant degree of similarity and likelihood of confusion as to source." *Id.*

Second, in *GMA Accessories, Inc. v. Croscill, Inc.,* No. 06 Civ. 6236 (GEL), 2008 U.S. Dist. LEXIS 16052 (S.D.N.Y. Mar. 3, 2008), the Court (Lynch, J.) considered the *Polaroid* factors in the context of determining whether material issues of fact precluded summary judgment on GMA's claim that the defendants in that case had infringed the "CHARLOTTE" mark by using the identical word mark (*i.e.,* "CHARLOTTE") on bathroom products, such as towels and shower curtains. In that context, the Court noted that, "[i]n assessing the similarity of two word marks, courts begin by examining their text, typeface, and general appearance," *id.,* at *17, although "'[a]n inquiry into the degree of similarity between two marks' . . . 'does not end with a comparison of the marks themselves,'" *id.,* at *17-18 (quoting *Savin Corp. v. The Savin Group,* 391 F.3d 439, 458 (2d Cir. 2004)). Rather, the Court recognized that, in order to determine the degree of similarity between two marks, it needed to consider "the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Id.* at *18 (quoting *Gruner + Jahn USA Publishing v. Meredith Corp.,* 991 F.2d 1072, 1078 (2d Cir. 1993)); *accord Star Industries, Inc. v. Bacardi & Co. Ltd.,* 412 F.3d 373, 386 (2d Cir. 2005). In other words,

even where two marks "appear very similar when viewed in isolation," the similarity may be "tempered" by differing packaging or presentation, *Star Industries,* 412 F.3d at 373, or by "the presence of a 'distinct brand name' appearing alongside [one or the other] mark,'" *Croscill,* 2008 U.S. Dist. LEXIS 16052, at *18 (quoting *Playtex Prods., Inc. v. Georgia-Pacific Corp.,* 390 F.3d 158, 164 (2d Cir. 2004)).

In *Croscill,* based on the evidentiary record presented to the Court, the Court found that, although the parties were using the exact same word mark (*i.e.,* the single word "CHARLOTTE"), the ways in which the parties used and displayed that mark raised questions as to the marks' "similarity." In particular, the parties used different typefaces for their marks, displayed them with different degrees of prominence, and "often present[ed] their respective brand names in tandem with" the "CHARLOTTE" mark. *Croscill,* 2008 U.S. Dist. LEXIS 160052, at *18-19. Accordingly, in weighing "similarity" as a *Polaroid* factor, the Court could not conclude – despite the fact that the word terms at issue were identical – that this factor weighed in favor of either party. *Id.* at *19; *see also, e.g., Juicy Couture, Inc. v. L'Oreal USA., Inc.,* No. 04 Civ. 7203 (DLC), 2006 U.S. Dist. LEXIS 20787, at *65-70 (S.D.N.Y. Apr. 19, 2006) (finding plaintiff's "JUICY" trademark to be dissimilar to defendant's "JUICY WEAR" mark, given factors such as "the prominent display of [defendant's] house brand on [its] product," the "consistent use of [defendant's] trade dress for all of its products," and the fact that plaintiff's mark was used on clothing and defendant's on lipstick).

In this case, we are not at a default stage, and both parties have been given a full opportunity to argue whether BOP's use of "CHARLOTTE RONSON" should be found to fall within the scope of the consent injunction. In addition, although the parties did not initially

submit evidence showing the degree of visual similarity between the parties' marks as those marks were being used by the parties on products, in advertising, or elsewhere,[5] the Court directed that the parties' submissions be supplemented, so that the Court could observe how "similar" the marks appeared in actual usage.  (*See* 5/9/08 Order; *see also Wolfard,* 113 F.3d at 1323 (affirming decision of district court, reached upon visually inspecting the two products at issue, that the defendant's product was a "colorable imitation" of plaintiff's, and that sale thus violated injunction).)

Having now reviewed both the parties' arguments and the marks as actually displayed, this Court finds that nothing about BOP's use of the "CHARLOTTE RONSON" mark, either on its website or on the actual clothing or related merchandise that it is offering for sale via its website, serves to differentiate that mark from GMA's "CHARLOTTE" mark, so as to "temper" the similarity of the word terms themselves.  With respect to BOP's website, the words "CHARLOTTE RONSON" are presented in a plain, unadorned, upper-and-lower-case typeface (*see* BOP's Exemplars, Exs. B (June 15, 2006 Images), C (Aug. 3, 2006 Images, D (May 13, 2008 Images), E (Sample Current "CHARLOTTE RONSON" Pages on BOP Website), apparently the exact same typeface that BOP had previously used on the same website to market "CHARLOTTE SOLNICKI" merchandise (*see id.*, Exs. B, C).  Nothing about this typeface or BOP's presentation on its website serves to make the "CHARLOTTE RONSON" mark stand

---

[5] The only such exemplars initially submitted by either party were photocopies submitted by GMA of (1) certain pages of BOP's allegedly offending website, on which "CHARLOTTE RONSON" branded merchandise was being offered for sale (*see* Scott Decl., Ex. C (BOP's website), and (2) a page of Sanei's allegedly offending website, on which BOP's website is listed as a retailer of "CHARLOTTE RONSON" branded merchandise (*see id.*, Ex. D (Sanei's website)).

apart from GMA's "CHARLOTTE" mark.  (*See* GMA's Exemplars, Ex. A (Images of

"CHARLOTTE" mark); Sanei's Exemplars, Exs. F-N (Images of "CHARLOTTE" mark).)

As for the labels on the actual "CHARLOTTE RONSON" merchandise that BOP is

offering for sale through its website, it appears that the typeface and overall style of the mark on

those labels is actually quite close to the way in which GMA currently uses its "CHARLOTTE"

mark on products such as women's clothing and shoes.  The typefaces, in both instances, present

a simple, clean, rounded style; and the word "CHARLOTTE," in both cases, is presented in all

lower-case letters.  (*See* BOP's Exemplars, Ex. A (Images of "CHARLOTTE RONSON" mark);

Sanei's Exemplars, Exs. A ("CHARLOTTE RONSON" hangtag  prior to March 2006), B

("CHARLOTTE RONSON" hangtag since March 2006), C (Images from Sanei website), F-N;

GMA's Exemplars, Ex. A.)  Furthermore, in at least some cases, the "CHARLOTTE RONSON"

mark is presented in a way that emphasizes the word "CHARLOTTE" over the word

"RONSON," by presenting the former in a larger font than the latter.  (*See* BOP's Exemplars,

Ex. A; Sanei's Exemplars, Exs. B, C.)

Overall, the "CHARLOTTE RONSON" mark, as used on the merchandise that BOP is

offering for sale is much *more* visually similar to the design of GMA's "CHARLOTTE" mark

than was the "CHARLOTTE SOLNICKI" mark that BOP expressly agreed would be covered by

the injunction.  Based on the exemplars submitted to the Court, it seems that the mark

"CHARLOTTE SOLNICKI," as used on merchandise labels, was presented in either a

distinctive cursive font, or in a stylized and embellished logo design – in both cases, with the

words "CHARLOTTE" and "SOLNICKI" equally prominent.  (*See* Sanei's Exemplars, Exs. D

("CHARLOTTE SOLNICKI" hangtag), E (Image from Charlotte Solnicki's website).)  Given

14

these exemplars, the Court concludes that the "CHARLOTTE RONSON" mark, as used by BOP both on its website and on the merchandise it is offering for sale, is either *as* similar in appearance – or *more* similar in appearance – to GMA's "CHARLOTTE" mark than was the "CHARLOTTE SOLNICKI" mark that BOP has specifically agreed was "similar to" GMA's mark.

As the parties are using the "CHARLOTTE" and "CHARLOTTE RONSON" marks on the same type of merchandise (*i.e.,* women's clothing and related merchandise), the only remaining question for the Court to consider with respect to the similarity of those marks is whether the mere association of the "RONSON" name with "CHARLOTTE" somehow renders the "CHARLOTTE RONSON" mark dissimilar to "CHARLOTTE." Although, at various times, in conferences before the Court, BOP has suggested that "RONSON" is a particularly well-known mark, BOP never makes this point in its brief in opposition to GMA's contempt motion, and certainly never attempts to support the point with any evidentiary submissions. Further, the relative lack of prominence of the "RONSON" name in the "CHARLOTTE RONSON" mark suggests that "CHARLOTTE" is the dominant name in that mark, and minimizes any differentiating impact that the "RONSON" name might otherwise have.

In sum, based on this Court's review of the words that make up the marks in question, as well as the visual display of the marks themselves, as used on BOP's website and on the women's clothing marketed by each party, the Court finds, by clear and convincing evidence, that the "CHARLOTTE RONSON" mark used by BOP is "similar to" GMA's mark "CHARLOTTE," and that BOP has thus failed to comply with the injunction.

This Court emphasizes, however, that its finding that "CHARLOTTE RONSON" is "similar" to GMA's "CHARLOTTE" mark is *not* equivalent to a finding that BOP has *infringed* GMA's trademark by using the "CHARLOTTE RONSON" mark.  Indeed, upon a full evaluation of all of the *Polaroid* factors, it may be that "CHARLOTTE RONSON" is not likely to cause confusion with GMA's "CHARLOTTE" trademark, and thus is not an infringing mark.  That is a determination that must be left for another day, if and when the issue of infringement is squarely before the Court.  At this juncture, suffice it to say that BOP voluntarily agreed, through its Rule 68 offer, to abide by an injunction that does not require it to refrain from using "infringing" marks, but rather to refrain from using "similar" marks.  As "similarity" is only one of the several *Polaroid* factors, nothing herein should be construed as a determination that BOP has been offering infringing merchandise for sale through its website.  *See, e.g., Taj Mahal Enterprises, Ltd. v. Trump,* 745 F. Supp. 240, 248-51 (D.N.J. 1990) (despite "clear" similarity of identical "TAJ MAHAL" word marks used by the parties, defendant's use of the mark was not likely to cause confusion in light of all relevant factors, and thus defendant's use was non-infringing).

D.     **BOP'S Efforts To Comply with the Injunction**

BOP also argues that, even if it has not been in compliance with the injunction, the Court should still find that it has been "reasonably diligent and energetic" in attempting to comply with its dictates.  On this point, BOP argues that the Court should follow the direction of the district court in *Wella*, which, on remand, declined to hold a non-compliant defendant in contempt where the plaintiff failed to prove, by clear and convincing evidence, that the defendant had been insufficiently diligent in attempting to effect compliance.  *See Wella Corp. v. Wella Graphics,*

16

*Inc.,* 874 F. Supp. 54, 56 (E.D.N.Y. 1994).  In that case, the defendant had established a new

corporation under an altered name that was based on a reasonable interpretation of the injunction

at issue, and had destroyed all materials showing the prior name.  *Id.*   Here, BOP argues that, by

ceasing its sales and advertisements of all "CHARLOTTE" and "CHARLOTTE SOLNICKI"

merchandise, it too has acted based on a reasonable interpretation of the injunction.  (*See* Tr., at

26, ll. 4-17; *see also* BOP Opp. Mem., at 10.)  The fact that BOP did nothing to alter its website

with respect to its use of the "CHARLOTTE RONSON" mark and made no steps to cease its

sales of "CHARLOTTE RONSON" goods, is, according to BOP, immaterial, as it reasonably

and in good faith believed that "CHARLOTTE RONSON" did not fall within the scope of the

injunction.  (*See* Tr., at 26, ll. 4-17; 73, ll. 24-25; 74, ll. 1-4; *see also* BOP Opp. Mem., at 10.)

 This argument, however, ignores the particular history of this case.  When the issue arose

as to whether "CHARLOTTE RONSON" was covered by the injunction, BOP sought

clarification of exactly that question from the Court, advancing its interpretation of the

injunction – *i.e.,* that it covered only the "CHARLOTTE" and "CHARLOTTE SOLNICKI"

marks.  Judge Swain squarely rejected that interpretation, and held that the injunction was

unambiguously broad enough to cover other marks – including two-word marks – that were

"similar to" the "CHARLOTTE" mark.  (*See* 12/20/07 Order, at 6, 8.)  Further, the Court

rejected BOP's alternative argument that, if the injunction were to be construed by the Court as

broader than BOP intended, then BOP should be relieved from its obligations to comply with it.

(*See id.*, at 7-8.)  Although the Court did not expressly rule that "CHARLOTTE RONSON" was

covered by the injunction, the plain suggestion of the Court's ruling – especially given the

context in which BOP's motion arose – was that the mark likely fell within the injunction's

17

proscriptions. Certainly, from the date of Judge Swain's decision, BOP was on notice that it would be acting at its own risk if it continued to market and sell "CHARLOTTE RONSON" merchandise. Thus, while BOP has a fair argument that it acted with reasonable diligence in seeking the Court's clarification or modification of the injunction, it has no basis for arguing that, once it failed to persuade the Court of its position, it made diligent efforts to avoid non-compliance.[6]

Accordingly, I recommend that BOP be held in contempt of the injunction, as of December 20, 2007, the date of the Court's denial of BOP's motion to modify or vacate the injunction.

### E.    Sanctions

#### 1.    Disgorgement of Profits

Sanctions for civil contempt are properly imposed for two purposes: (1) to coerce compliance with the Court's order, and (2) to compensate the plaintiff for losses caused by the defendant's past non-compliance. *United States v. United Mine Workers of America,* 330 U.S. 258, 303-304 (1947); *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 657 (2d Cir. 2004); *New York State Nat'l, Org. for Women*, 886 F.2d

---

[6] This Court notes that, in a teleconference with counsel on May 1, 2008, it indicated that, although it had not yet decided the issue, it was preliminarily inclined to recommend that BOP not be held in contempt. This, however, should not have given BOP comfort that it was then free to market and sell "CHARLOTTE RONSON" merchandise. First, that conference was in advance of the parties' oral argument on the contempt motion, and it was clear that this Court was not going to make a recommendation without hearing argument from both parties. Second, at the start of that oral argument, the Court indicated that, upon closer review of Judge Swain's December 20, 2007 decision, it believed that the question of the scope of the injunction may have already been decided. (*See* Tr., at 15, ll. 16-24.) Further, the Court explicitly advised BOP's counsel that, as BOP might well find itself being held in contempt, it should carefully consider whether to risk making continued sales of "CHARLOTTE RONSON" merchandise. (*See id.,* at 55, ll. 13-25; 56, ll. 1, 4-11.)

at 1352. While it is not necessary for the contemnor's conduct to have been "willful" for it to be subject to sanctions, *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1, 5 (2d Cir. 1989), *cert. denied,* 494 U.S. 1029 (1990), civil contempt proceedings may not result in "punitive" sanctions; rather, "any award must be remedial and compensatory," *id.* (citations and internal quotation marks omitted).

The fact that the Court should look to "compensate" a plaintiff for losses resulting from the defendant's contempt does not mean that the plaintiff may only recover upon proof of "actual pecuniary loss." *Id.* On the contrary, "profits derived by the contemnor from violation of a court order . . . are an equivalent or substitute for legal damages, when damages have not been shown, and are recoverable not by way of punishment but to insure full compensation to the party injured." *Id.* at 5-6 (citations and internal quotation marks omitted); *see also, e.g., National Basketball Ass'n v. Design Management Consultants, Inc.,* 289 F. Supp. 2d 373, 378 (S.D.N.Y. 2003) ("[P]laintiffs are entitled to the net profits defendants earned from selling Disputed Merchandise in violation of the Order."); *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, No. 96 Civ. 9721 (PKL) (THK), 2002 U.S. Dist. LEXIS 16323, at *35 (S.D.N.Y. Sept. 3, 2002) (awarding plaintiff in a civil contempt action "a compensatory fine equal to any profits made by [defendant] via activities in violation of the preliminary injunction"); *Fendi Adele S.R.I. v. Burlington Coat Factory Warehouse Corp.,* No. 06 Civ. 0085 (LBS), 2007 U.S. Dist. LEXIS 76812, at *16 (S.D.N.Y. Oct. 10, 2007) (ordering disgorgement of defendants profits as a civil contempt sanction).

In this case, this Court is persuaded that a coercive sanction is not required, as the Court has received assurances from BOP's counsel that, should the Court expressly find BOP to be in

non-compliance with the injunction, BOP would immediately refrain from further sales or marketing of "CHARLOTTE RONSON" merchandise.  (*See* Tr., at 54, ll. 7-15.)  Nothing in BOP's history suggests that this representation by its counsel cannot be trusted.  A compensatory sanction, however, would be appropriate.

In this regard, GMA's counsel suggested, at oral argument, that BOP should be required to pay to GMA a sum equaling not just BOP's net profits from its sales of "CHARLOTTE RONSON" merchandise, but its gross revenue from such sales.  (*See* Tr., at 66, ll. 13-16.)  Not only would this be far greater than a "compensatory" award, but, as a potential contempt remedy, it finds no support in the case law.  Even the cases cited by GMA in its brief involved the disgorgement of *profits*, not gross revenue.  (*See* cases cited in Memorandum of Law in Support of GMA's Order to Show Cause for BOP and Sanei's Contempt, dated Mar. 26, 2008 (Dkt. 161), at 3-4; Memorandum of Law in Reply to the Opposition/Request to Sever, dated Apr. 18, 2008 (Dkt. 193), at 6-7.)  Based on such cases, and those cited above, I recommend that BOP be required to disgorge to GMA its profits from any sales of "CHARLOTTE RONSON" merchandise, after December 20, 2007.[7]

---

[7] This Court has not thus far received evidence from BOP as to the amount of profits it earned from any sales of "CHARLOTTE RONSON" merchandise during the relevant period, and it may be that there will be no dispute between the parties as to that figure.  If, however, Judge Swain accepts this recommendation, and then such a dispute arises, this Court will, at Judge Swain's request, accept evidentiary submissions as to BOP's profits, and issue a supplemental Report and Recommendation addressing the amount that should be awarded.  The Court notes that, if the parties do dispute the amount of BOP's profits, the burden will be on BOP "to prove any deductions for its costs from the gross revenues attributable to its contempt." *Manhattan Indus.,* 885 F.2d at 7 (citation and internal quotation marks omitted).

2.    **Attorneys' Fees and Costs**

Most courts in this Circuit "strictly adhere" to the general principle that, for attorneys fees and costs to be awarded on a contempt motion, the contemnor's conduct must have been "willful." *Davidoff v. CVS Corp.,* No. 06 Civ. 15332 (RJS), 2008 U.S. Dist. LEXIS 36548, at *21-22 (S.D.N.Y. Apr. 18, 2008). But if the Court does find that the defendant's violation was willful, it should then award attorneys' fees and costs "unless there are 'persuasive grounds' to deny them." *Chao,* 514 F.3d at 291 (quoting *Weitzman v. Stein,* 98 F.3d 717, 719 (2d Cir. 1996)). "A willful contempt is one where 'the contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply." *Fendi Adele S.R.I.,* 2007 U.S. Dist. LEXIS 76812, at *12 (quoting *Bear U.S.A.,* 71 F. Supp. 2d at 249).

In this case, as discussed above, BOP did seek to have the injunction modified, but it failed in that attempt. From that point forward, it made no effort at all to comply with the terms of the injunction, as construed by the Court. Under the circumstances, I find that BOP's non-compliance was willful as of December 20, 2007, the date of the Court's prior ruling, and I therefore recommend that BOP be required to pay the attorney's fees and costs that were then incurred by GMA in bringing its contempt motion.

II.    **THE CONTEMPT MOTION AGAINST SANEI**

GMA's contempt motion is directed against Sanei, as well as against BOP, although Sanei was not a party to the consent injunction, nor even a party in the BOP litigation. Essentially, GMA's motion against Sanei is based on Rule 65 of the Federal Rules of Civil Procedure, which provides, in relevant part, that a court order granting an injunction binds not

only the parties, but also "other persons who are in active concert or participation with" the parties, provided such other persons "receive actual notice" of the order.  Fed. R. Civ. P. 65(d)(2).

Sanei has responded to GMA's motion by seeking an order from the Court severing and staying the motion against it from any proceedings against BOP, pending the outcome of a separate action pending in the Court before the Honorable Robert W. Sweet, *Sanei Charlotte Ronson LLC v. GMA Accessories, Inc.,* No. 07 Civ. 9578 (RS)(DF), in which Sanei and GMA have directly squared off over the question of whether "CHARLOTTE RONSON" infringes GMA's "CHARLOTTE" mark.  (*See* Sanei Mem. to Sever.)  Alternatively, Sanei requests that GMA's contempt motion against it be denied, on the grounds that the injunction does not clearly and unambiguously cover "CHARLOTTE RONSON"; that, as a result of prior positions taken by GMA in the United States Patent and Trademark Office (the "PTO") and in the *Sanei* case pending in this Court, GMA should be judicially estopped from arguing that "CHARLOTTE RONSON" is similar to its "CHARLOTTE" mark; and that, in any event, Sanei has not acted in "active concert or participation" with BOP.  (*See* Sanei Opp. Mem.)

### A.    Sanei's Motion To Sever or Stay These Proceedings

Sanei has moved to sever and stay GMA's contempt motion against it, pending resolution of the separate *Sanei* action.  Sanei commenced that action against GMA on October 26, 2007, seeking, *inter alia,* a declaratory judgment that its use of the "CHARLOTTE RONSON" mark did not infringe GMA's "CHARLOTTE" mark.  GMA, for its part, counterclaimed for infringement.  Sanei argues that, in light of that pending action, in which the Court will eventually decide, based on plenary proceedings, whether "CHARLOTTE RONSON" is an

infringing mark, it would be unfair for the Court to determine that question – or even a single

issue relevant to that question – at this time, on a more limited record, potentially subjecting

Sanei to collateral estoppel in the *Sanei* case.[8]  (*See* Sanei Mem. to Sever, at 6-12.)

The doctrine of collateral estoppel "precludes a party from relitigating in a subsequent

action or proceeding an issue clearly raised in a prior action or proceeding and decided against

that party or those in privity."  *Yeiser v. GMAC Mortgage Corp.*, 535 F. Supp. 2d 413, 424

(S.D.N.Y. 2008) (citing *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823 (1984);

*see Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir.

1995) (citation omitted).  In order for collateral estoppel to apply, the issue in the two

proceedings must be identical, the estopped party must have had a full and fair opportunity to

litigate the issue in the prior proceeding, the issue must have been actually litigated and actually

decided in the prior proceeding, and the issue must have been necessary to support the

determination on the merits in the prior proceeding.  *See Leather v. Ten Eyck*, 180 F.3d 420, 425-

426 (2d Cir. 1999) (citing *Central Hudson Gas & Elec. Corp.*, 56 F.3d at 368).

Here, the "issue" that Sanei asks this Court to refrain from deciding is the "similarity" of

its "CHARLOTTE RONSON" to GMA's "CHARLOTTE" mark, an issue that, for the reasons

discussed above, would be necessary to any determination that Sanei violated the injunction.

Obviously, the Court has addressed that issue already, in connection with GMA's contempt

motion against BOP.  Yet, as collateral estoppel will only preclude a party from relitigating an

---

[8] Sanei also suggests that a determination against it in this proceeding could have adverse
collateral consequences in pending proceedings between Sanei and GMA before the Trademark
Trial and Appeal Board that have been suspended pending the outcome of the *Sanei* case.  (*See*
Sanei Mem. to Sever, at 6.)

issue where the decision binding *that party* necessarily relies on the resolution of that issue, Sanei need not be concerned regarding the threat of later preclusion. Based on the nature of Sanei's conduct, this Court recommends that GMA's contempt motion against Sanei be denied on the ground that GMA has not established that Sanei acted in active concert with BOP to violate the injunction. As no decision regarding the similarity of the marks would be necessary to support such a determination, this Court sees no reason to sever and stay GMA's motion against Sanei.

### B.    Sanei Should Not Be Found To Have "Acted in Concert or Participation" with BOP.

As already noted, Sanei was not a party to the consent injunction at issue. Nor was it the drafter of the language of that injunction, and, accordingly, any policy reasons that may weigh in favor of holding BOP to the terms of its Rule 68 offer or its resulting settlement agreement (*see* 12/20/07 Order, at 6-8) do not apply to Sanei. Similarly, when courts speak of not allowing enjoined parties to "test the outer boundaries" of orders that have already been issued against them by the Court, whether after plenary proceedings or upon consent, *see, e.g., Wella Corp.*, 874 F. Supp. at 56, it should be recognized that such principles do not apply with the same force to wholly separate parties that have not yet had their day in court. Against this backdrop, GMA's argument that Sanei should be held in contempt of the injunction for "acting in concert or participation" with BOP should be carefully scrutinized.[9]

---

[9] The Court also notes that, while Sanei does not dispute that it received "actual notice" of the injunction against BOP, GMA apparently never served a copy of that injunction on Sanei, despite being aware of Sanei's existence and its role as BOP's supplier of "CHARLOTTE RONSON" merchandise. (*See* GMA Mem., at 4.)

Rule 65(d)(2) of the Federal Rules of Civil Procedure is derived from the common law principle that a non-party may be held in civil contempt of a court order on the grounds that it either is legally identified with the party named in the order or aids and abets the party named in the order in its noncompliance. *See People v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996) (citing *Alemite Mfg. Corp. v. Staff*, 42 F. 2d 832 (2d Cir. 1930)); *Vuitton et Fils S.A. v. Caroudel Handbags*, 592 F.2d 126, 129 (2d Cir. 1979); *Matrix Essentials v. Quality King Distributors, Inc.*, 346 F. Supp.2d. 384, 391 (E.D.N.Y. 2004) (citing *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)).  While a court cannot "bind the world at large through a broadly worded injunction," *Vuitton et Fils*, 592 F.2d at 129; *see Almemite Mfg. Corp.*, 42 F. 2d at 832, defendants may not "nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding," *Regal Knitwear Co.*, 324 U.S. at 14; *see Forschner Group, Inc. v. New Trends, Vrolixs J.-C.*, Civ. A. No. B-89-531 (JAC), 1994 WL 708129 (D.Conn. Aug. 10, 1994) (citing *Regal Knitwear Co.*, 324 U.S. at 14).

A non-party may be found to be "legally identified" with an enjoined party where, "as a practical matter," the two individuals or entities are "one and the same," *Spectacular Venture, L.P. v. World Star Int'l, Inc.,* 927 F. Supp. 683, 684-85 (S.D.N.Y. 1996) (for purposes of contempt analysis, finding defendant corporation's president and principal to be "one and the same" as the corporation), or where "there is a substantial continuity of identity between the two organizations," *Operation Rescue,* 80 F.3d at 70.  Courts in this Circuit have also found a non-party to be in active concert or participation with an enjoined party where the non-party is controlled and used by the enjoined party "as a device to circumvent the Court's orders." *Cablevision Sys. Corp v. Muneyyirci*, No. CV 90 2997 (RJD), 1995 WL 362541, at *2 (E.D.N.Y.

25

June 2, 1995).  Thus, where an enjoined party engages in subterfuge, and attempts to circumvent

an injunction through the instrumentality of a shell company, an agent, or a successor in interest,

the injunction will reach the conduct of the non-party.  *See Operation Rescue,* 80 F.3d at 70

("[A]n organization and its agents may not circumvent a valid court order merely by making

superficial changes in the organization's name or form, and in appropriate circumstances a court

is authorized to enforce its order against a successor of the enjoined organization) (citing *Golden*

*State Bottling Co. v. NLRB,* 414 U.S. 168, 179 (1973)); *Cablevision Sys.,* 1995 WL 362541, at *2

(finding that injunction reached the operations of non-party corporation, where enjoined parties

had incorporated that entity "on the very day [the] Court issued the preliminary injunction," and

had continued to engage in enjoined conduct through their control of the new corporation).

"Active concert" has also been found where an enjoined party is substantially intertwined

with a non-party, *see e.g., Marshall v. Blasters, Drillerunners, and Miners Union, Local 29*, No.

78 Civ. 4619 (RWS), 1980 WL 2150, at *3 (S.D.N.Y. Apr. 14, 1980) (non-party benefit fund

was in active concert with enjoined union where the court found that because they occupied the

same offices, benefit fund paid expenses of two union employees, and union had considerable

control over benefit fund's daily operations, the interconnections between the union and the

benefit fund were "substantial"), and where it has been shown that a non-party has consciously

and actively attempted to assist the enjoined party in evading an injunction, *see e.g., S.E.C. v.*

*Platinum Investment Corp.*, No. 02 Civ. 6093 (JSR) (S.D.N.Y. Mar. 25, 2003) (slip op.) (where

party whose assets were frozen by injunction transferred assets to family members, who assisted

in the transfer and a subsequent withdrawal of funds in circumvention of court order, family

members acted "in concert" with enjoined party), *aff'd,* 98 Fed. Appx. 33 (2d Cir. 2004); *Bear*

*U.S.A.,* 71 F. Supp. at 246 (where particular, inventoried goods that were the subject of an injunction were being held in the custody of a non-party, and where the custodian knowingly cooperated with the enjoined party by providing access to the inventory for the purpose of violating the injunction, custodian could be held in contempt).

"Whether one not named in an injunctive decree may nevertheless be bound by it depends on the facts of each case," *Vuitton et Fils,* 592 F.2d at 130, and, here, GMA, as the party seeking to enforce the terms of the injunction against Sanei, bears the burden of showing that Sanei is within the scope of the injunction, *see Operation Rescue*, 80 F.3d at 70 (citing *Vuitton et Fils*, 592 F.2d at 129). GMA, however, has shown nothing other than that Sanei, as the maker of "CHARLOTTE RONSON"-branded merchandise, filled BOP's purchase orders for such goods, which BOP then offered for sale on its website. GMA has made no showing that Sanei is "legally identified" with BOP, or is an agent or instrumentality of BOP, or is effectively a successor to BOP, or indeed that the two companies are intertwined or related in any manner, other than through arms' length business transactions. GMA has also made no showing that Sanei has attempted to aid BOP in circumventing the injunction, by offering BOP, for example, an alternative online outlet for consummating BOP's desired customer sales.

Moreover, the legal precedent relied upon by GMA to support its position that Sanei acted "in active concert or participation" with BOP is, for the most part, neither analogous to the instant case nor even relevant to the question at hand. For example, in its moving brief, GMA cites *Inwood Laboratories v. Ives*, 456 U.S. 844 (1982), for the proposition that "a supplier is equally responsible for the counterfeiting of others if those other parties obtain the counterfeit goods from it." (GMA Mem. at 4.) *Inwood Laboratories,* however, did not involve any

application of the "acting in concert" language of Rule 65(d), but rather addressed the quite

different question of whether a manufacturer of a generic drug, "designed to duplicate the

appearance of a similar drug marketed by a competitor under a registered trademark, *can be held*

*vicariously liable for infringement* of that trademark by pharmacists who dispense the generic

drug." *Id.* at 846 (emphasis added).  The question of whether Sanei may be found liable for

infringement of GMA's "CHARLOTTE" mark is not presently before this Court.  *See*

*Paramount Pictures Corp. v. Carol Publishing Group, Inc.,* 25 F. Supp. 2d 372, 375-76

(S.D.N.Y. 1998) (noting that, even if the plaintiff were correct that certain retailers and

distributors that had done business with the defendant publisher could themselves be liable for

copyright infringement, this would not give the Court "a basis for expanding the scope of the

injunction against [the defendant]").

GMA also relies on *Operation Rescue* to support its position that Sanei should be held in

contempt.  (*See* GMA Mem. at 4.)  That case, though, involved the conduct of an organization

that was "substantially a continuation of the [previously enjoined] organization," a very different

situation than the one presented here.  *See Operation Rescue,* 80 F.3d at 71.  Similarly, GMA's

reliance on *Spectacular Venture, L.P. v. World Star Int'l, Inc.,* 927 F. Supp. 683 (S.D.N.Y. 1996)

(cited in GMA Reply Mem., at 6), is misplaced, as that case involved the conduct of an

individual who, as the enjoined corporation's principal, was "legally identified" with that

corporation.  *See Spectacular Venture,* 927 F. Supp. at 684-85.

The only authority cited by GMA with facts that even arguably parallel those of this case

is *Paramount Pictures Corp. v. Carol Publishing Group*, 25 F. Supp. 2d 372 (S.D.N.Y. 1998)

(cited in GMA Reply Mem. at 6), in which the Court considered whether the conduct of wholly

28

distinct business entities (retailers and distributors) could be covered by an injunction directed to the conduct of the defendant (a book publisher), by virtue of their contractual relationships with the defendant. *Paramount Pictures,* 25 F. Supp. 2d at 374-76. Noting, however, that "[e]ach case is fact specific," *id.* at 375, the Court rejected the plaintiff's effort to extend the injunction to cover the conduct of the non-parties, finding that the plaintiff had not even satisfied the threshold requirement of showing that the non-parties' allegedly contumacious conduct occurred after the injunction had issued, rather than before, *id.* In denying the motion for contempt against the retailers and distributors, the Court determined that the injunction at issue could extend neither to "a 'past contractual relationship' . . . nor to independent action taken by nonparties on their own behalf." *Id.* (citation omitted).

Here, at most, GMA has demonstrated that, at some point, Sanei sold "CHARLOTTE RONSON" merchandise to its customer, BOP. GMA has presented no evidence (much less clear and convincing evidence) as to when such sales took place, but even assuming that at least some sales post-dated the issuance of the injunction, there is nothing in the record to suggest that Sanei made such sales for the purpose of assisting BOP in evading a court order. Certainly, there is no indication in the record that BOP sought to "nullify" the injunction by carrying out prohibited acts through Sanei. *See Regal Knitwear,* 324 U.S. at 14. Based on the history of Rule 65(d) and the weight of authority in this Circuit as to the type of conduct that would constitute "acting in concert" under that rule, Sanei's independent sales, made by Sanei on its own behalf, do not appear to be the type of manipulative conduct that Rule 65 was designed to reach.

Accordingly, I recommend that Sanei *not* be held in contempt of the injunction entered by the Court against BOP.[10]

## CONCLUSION

For all the foregoing reasons, I respectfully recommend that GMA's contempt motion against GMA and Sanei, brought on by Order To Show Cause (Dkt. 159), be resolved as follows:

(1)     I recommend the Court find that BOP's continued use of the "CHARLOTTE RONSON" mark after December 20, 2007, constituted contempt of the Court's Order and Judgment dated October 18, 2007, and that BOP be required to disgorge the profits it earned from its sales of "CHARLOTTE RONSON" merchandise for the period from December 20, 2007 to the present.  I also recommend that BOP's non-compliance be found to be willful, and that BOP therefore be required to pay the reasonable attorneys' fees and costs incurred by GMA in making its contempt motion.  I recommend, however, that any further sanction against BOP as may be requested by GMA be denied as unnecessary to coerce future compliance with the Judgment or to compensate GMA for its injuries.

---

[10] As noted above, Sanei opposed GMA's contempt motion against it on a number of grounds, including that GMA should be held judicially estopped from taking the position that "CHARLOTTE RONSON" is similar to "CHARLOTTE," as a result of contrary positions it purportedly took either in the PTO or in the *Sanei* case.  (*See* Sanei Opp. Mem., at 9-12, 14-21.) This Court finds Sanei's argument in this regard to be somewhat confusing, given that the prior GMA positions to which Sanei is apparently referring were either (a) directed to the similarity of the "CHARLOTTE" mark and other marks (such as "CHARLOTTE RUSSE" and "CHARLOTTE SAYVILLE") that are not at issue here, or (b) related to whether GMA had ever threatened any of Sanei's customers with litigation over their use of the "CHARLOTTE RONSON" mark, which is different from the question of whether that mark should be found "similar" to "CHARLOTTE" under the terms of a consent injunction.  In any event, the Court need not reach the issue of judicial estoppel raised by Sanei, as GMA's contempt motion against Sanei may be resolved on other grounds.

(2)    I recommend that BOP's request that Sanei be held in contempt of the

October 18, 2007 Order and Judgment against BOP be denied, on the ground that BOP has not

adequately demonstrated that Sanei was "in active concert or participation" with BOP within the

meaning of Fed. R. Civ. P. 65.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have ten (10) days from service of this Report to file written

objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

Laura Taylor Swain, United States Courthouse, 500 Pearl Street, Room 755, New York, New

York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street,

Room 525, New York, New York, 10007. Any requests for an extension of time for filing

objections must be directed to Judge Swain. FAILURE TO FILE OBJECTIONS WITHIN TEN

(10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE

APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension*

*Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d

Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714

F.2d 234, 237-38 (2d Cir. 1983).

Dated:   New York, New York
         May 29, 2008

                                          Respectfully submitted,


                                          _____
                                          DEBRA FREEMAN
                                          United States Magistrate Judge

31

Copies to:

Hon. Laura T. Swain, U.S.D.J.

John P. Bostany, Esq.
The Bostany Law Firm
40 Wall Street
New York, NY 10005

Robert D. Kaplan, Esq.
Friedman Kaplan Seiler & Adelman LLP
1633 Broadway
New York, NY 10019

Ira S. Sacks, Esq.
Dreier LLP
499 Park Avenue
New York, NY 10022